### MAURAN v. INSURANCE COMPANY.

1. A taking of a vessel by the naval forces of a now extinct rebellious confederation, whose authority was unlawful and whose proceedings in overthrowing the former government were wholly illegal and void, and which confederation has never been recognized as one of the family of nations, is a "capture" within the meaning of a warranty on a policy of insurance having a marginal warranty "free from loss or expense by capture,"—if such rebellious confederation was at the time sufficiently in possession of the attributes of government to be regarded as in fact the ruling or supreme power of the country over which its pretended jurisdiction extended.

2 Accordingly, a seizure by a vessel of the late so-called Confederate States of America, for their benefit, was a capture within the terms of such a warranty.

ERROR to the Circuit Court for Massachusetts.

Mauran brought suit in that court against the Alliance Insurance Company on a policy of insurance upon the ship Marshall for one year from the 29th November, 1860, covering the sum of $8000. The insurance, as stipulated in the body of the policy, was "against the adventures and perils of the seas, fire, enemies, *pirates, assailing thieves*, restraints, and detainments of all kings, princes, or people of what nation or quality soever."

In the margin of the policy was the following:

"Warranted by the assured free from loss or expense arising from *capture*, seizure, or detention, or the consequences of any

attempt thereat, any stipulations in this policy to the contrary notwithstanding."

The vessel was seized on the afternoon of the 17th of May, 1861, two or three miles inside of the bar at the mouth of the Mississippi River, on her way up to New Orleans, by the officers and crew of the steamer Music, belonging to the so-called Confederate States. Some persons on board the steamer at the time of the seizure, hoisted the Confederate flag to the mast-head of the Marshall, and informed the captain and pilot that the ship was " a prize to the Confederate States." Verdict and judgment having been given in favor of the insurance company, the question here on error was, whether this taking of the vessel by the naval forces of the so-called Confederate States was a *capture* within the warranty of the assured in the margin of the policy? If it was, then the loss was not one of the perils insured against, and the judgment below was right.

*Mr. Cushing (who submitted with his own, a learned brief of Messrs. R. H. Dana, Jr., and Horace Gray, Jr., in the case of another vessel before the Supreme Court of Maine), for the plaintiff in error:*

If this loss was by " assailing thieves" or " pirates," then the insurers are bound to pay; for undoubtedly a taking by assailing thieves or pirates does not operate to make in law a " capture." Rovers, thieves and pirates have always been treated as ordinary perils of the sea. Chancellor Kent* lays down the distinction in explicit terms:

" The enumerated perils of the sea, *pirates, rovers, thieves,* include the wrongful and violent acts of individuals, whether in the open character of felons, or in the character of a mob, or as a mutinous crew, or as plunderers of shipwrecked goods on shore. . . . But the stipulation of indemnity against *takings at sea, arrests, restraints, and detainments of all kings, princes, and people,* refers only to the acts of government for government purposes, whether right or wrong."

---

* 3 Commentaries, 302, note *d*, 6th ed.

Other writers make the same classification.* " Taking by pirates," says Mr. Dane,† " has none of the effects of legal capture."

Now, can *this court*, a court of *the United States*, treat the persons who made the seizure here otherwise than as pirates or thieves?   The political department of the government, it will be conceded, has never acknowledged the rebel confederation as a government *de facto*, any more than one *de jure*.   On the contrary, it is matter of common knowledge that it has most scrupulously, and in every form, avoided doing so.   As to their captures of ships, it has actually treated them as " pirates."

The Crimes Act of 1790‡ makes the taking of a vessel of the United States by rebels an act of piracy.   It says:

"If *any citizen* shall commit any *piracy* or *robbery* aforesaid, or any act of hostility *against* the United States, or *any citizen thereof*, upon the high seas, *under color of* any commission from any foreign prince or state, or *any pretence of authority* from *any person, such offender shall, notwithstanding the pretence of any such authority*, be deemed, adjudged, and taken to be a pirate, felon, and robber; and on being thereof convicted, shall suffer death."

In *United States* v. *Wiltberger*,§ the court, *obiter*, says that the *sole* object of this statute was to reach a citizen of the United States who depredates on commerce of the United States *under color of a foreign commission*.   The word "foreign" here includes, of course, any government *other than the United States*, and especially a pretended government; and most especially a pretended government in rebellion against our own.

The definition of piracy by the law of nations is this:

"Depredating on the seas, without being authorized by any

---

* Nesbitt v. Lushington, 4 Term, 783; 2 Arnould on Insurance, §§ 303, 305, 306; 1 Phillips on Insurance, §§ 1106–1108; 2 Parsons' Maritime Law, 236, 246.

† 7 Abridgment, 92; and see 639 *et seq.*

‡ § 9, 1 Stat. at Large, 114.                    § 5 Wheaton, 76.

sovereign state, or with commissions from different sovereigns at war with each other."*

Of course, looking to all the conditions of the rebellion, cruising by rebels who are *as yet unacknowledged by anybody*, even as a *de facto* government, would be cruising *without being authorized by any sovereign*, and so would be piracy by the law of nations.†

The proclamation of the President of the United States of April 19, 1861,‡ is explicit, as follows:

" And I hereby proclaim and declare, that if any person, under the pretended authority of said (Confederate) States, or under any other pretence, shall molest a vessel of the United States, or the persons or cargo on board of her, such person will be amenable to the laws of the United States for the prevention and punishment of piracy."

This proclamation is fully justified by the section of the Crimes Act heretofore cited. It was in force at the time of the taking of the ship Marshall. Its applicability is recognized by successive acts of Congress,§ and it was obligatory on every citizen of the United States; construing every contract made within the United States between citizens of the same.

How then can this court, a depository of the judicial power of the United States, recognize as a government of *any* kind, a confederation whose representatives the political department proclaims to be pirates, and who, as in the case of Smith, tried before GRIER, J.,‖ have been tried and convicted as such.

In whatever light they may be to be looked on by the courts of foreign powers, certainly all cruisers, under the flag of whatever combination of persons, are, in all courts *of the United States*, to be regarded as pirates by the law of nations,

---

* Lawrence's Wheaton's Int. Law, 246, ed. 1863.

† United States *v.* Klintock, 5 Wheaton, 144.

‡ 12 Stat. at Large, 12, 58.

§ Act of 24 July, 1861, Id. 273; Act of 6 Aug., 1862, Id. 814.

‖ 3 Wallace, Jr., MS.

unless such persons have been recognized by the Executive as lawful belligerents, and so a *de facto* government. That this is a true principle of law, this court decided on all the questions arising out of the Spanish-American Revolution, holding that if the captors represented a *de facto* authority *recognized by the Executive* of the United States, they were not pirates by the law of nations;[*] but that if not so recognized by the Executive, they were.[†] Indeed, on these public questions, courts must respect the acts of their own governments, whether herein those acts be reasonable or unreasonable, or even right or wrong. They cannot stultify their own countries.

So also is the law of Great Britain. In a debate on a matter quite kindred to this one, Lord Chelmsford said :[‡]

"If the Southern Confederacy had not been recognized by us as a belligerent power, he agreed with his noble and learned friend (Lord Brougham), that any Englishman aiding them by fitting out a privateer against the Federal government would be guilty of piracy."

The Lord Chancellor (Campbell) impliedly admitted this, in saying that an Englishman entering the Confederate service could not be deemed a pirate after the publishing of the Queen's proclamation recognizing the Southern States as "entitled to the exercise of belligerent rights and carrying on what might be called a *justum bellum.*"

In accordance with these views is the case of *Swinerton* v. *Columbian Insurance Company*, in the Superior Court of New York City. There a policy of insurance was made on a schooner against the usual perils, including "pirates, rovers, thieves," but "warranted free from loss or expense arising from capture, seizure, or detention, or the consequences of

---

[*] United States *v.* Palmer, 3 Wheaton, 610, 634; The Divina Pastora, 4 Id. 52; Nuestra Senora de le Caridad, Id. 497; The Josefa Segunda, 5 Id. 838; Nueva Ana, 6 Id. 193; Santissima Trinidad, 7 Id. 337.

[†] United States *v.* Klintock, 5 Wheaton, 144; United States *v.* Smith, Id. 153.

[‡] Hansard, vol. 162, p. 2082.

any attempt thereat." The vessel was lying at Norfolk, for repair, on the 21st of April, 1861, four days after the passage, by the State of Virginia, of her "secession ordinance," when a band of men came alongside of her with a steamboat, and professing to act by authority of the State of Virginia, without riot or tumult, towed her out into the channel, and there sunk her. The Superior Court, at first at *nisi prius*, and then *in banc*, held that the secession ordinance could not be admitted in evidence for the defence; and that the loss did not come within the exception, but was a loss by pirates, rovers, and thieves. So also in point is the case, before the Commercial Court, or Handelsgericht, of Bremen,* of the Harvest, captured by the Shenandoah, a rebel cruiser; where a similar decision was made, and supported by a learned opinion. It will be strange if foreign courts pay a respect to what is done by the political department of our government which the courts of our own country do not.

*Messrs. B. R. Curtis* and *Storrow, contra :*

The policy uses the word "pirates" in that simple and ordinary sense, in which it now is, and immemorially has been, known to the general commercial law of the civilized world; and not to describe offenders against some municipal criminal law, of some particular country. The interpretation and effect of policies belong to a system of law, existing before the statute of 1790, or any of President Lincoln's proclamations were made, and was not intended to be affected by them. This system of law is not merely a branch, or division of municipal law, but belongs to, and is part of, the common law of nations which defines piracy.†

Such instruments have no reference to the *legality* of governments: they refer always to *de facto* authority of kings, princes, and people; and an interpretation which

---

* Weser Weekly Zeitung, of January 12, 1867. A printed translation was furnished by Mr. Cushing to the court.

† Warren *v.* The Man. Ins. Co., 13 Pickering, 518; Deshon *v.* The Mer. Ins. Co., 11 Metcalf, 199; The Malek Adhel, 2 Howard, 232; The Antelope 10 Wheaton, 122.

should make a risk depend on the legality of an actual government, under whose authority the property had been captured, seized, or detained, would be unprecedented and dangerous.* Lemonnier† cites a decision of the Tribunal of Commerce, of Marseilles, that the revolted Colombians, having attacked only Spaniards, and not all nations like pirates, were to be considered a government.

No authority can be produced to show that a capture under a commission issued by a regularly organized *de facto* government, engaged in open and actual war, to cruise against its enemy, and against its enemy only, is piracy *under the laws of nations.*

The authorities are the other way.‡

The Executive government of the United States has, by public proclamations and messages to Congress, and in other appropriate public documents, recognized and affirmed a condition of open and public war, existing between the United States and a *de facto* government of the so-called " Confederate States."§ And the United States cannot at the same time insist that they have the belligerent rights which by the law of nations belong to a sovereign waging public war, and yet assert that there is no such public war as is known to the law of nations. That it is a *civil* war, does not change the rule of *the law of nations* respecting those who carry it on.‖

Any capture or seizure, whether rightful or wrongful, and

---

* Nesbitt *v.* Lushington, 4 Term, 783.  † On Insurance, vol. 1, 251.

‡ The Savannah, Warburton's Report, 365–374; United States *v.* Smith, 5 Wheaton, 153, and note; Same *v.* Pirates, Id. 196 ; The Malek Adhel, 2 Howard, 211; The Sealskins, 2 Paine, 333; United States *v.* Hanway, 2 Wallace, Jr., 202; and see Mr. Burke's letter to Sheriffs of Bristol, vol. 2, p. 90, Little & Brown's edition of Burke's Works; Mr. Webster's Letter to Mr. Fox, 6 Webster's Works, 256, 257.

§ The President's Proclamation of April 19, 1861; his Reply to the Virginia Commissioners (Moore's Rebellion Record, vol. i, p. 61); his Proclamation of April 27, 1861; his Message to Congress, July 4, 1861; his Proclamations of August 12, 1861, and of August 16, 1861.

‖ Vattel (Chitty's ed.), 424; Lawrence's Wheaton, 516, 522; Halleck's International Law, 233, 343; Santissima Trinidad, 7 Wheaton, 283; United States *v.* Palmer, 3 Id. 610; Neustra Senora, 4 Id. 497.

whether made under a commission from a *de jure,* or *de facto* government, or made by mere pirates, is equally within the warranty in this case. Such is the interpretation of the words " capture, seizure, and detention," by writers of authority on Insurance,* and by courts also. The English cases of *Powell* v. *Hyde,*† and of *Kleinworth* v. *Shephard,*‡ are in point. In the former case it was held by Lord Campbell, Coleridge and Wightman, JJ., that the loss of a British vessel in the Danube by being fired upon by the Russians (then at war with Turkey, but not with England), was within the exception of " warrant free from capture and seizure," and in the second the terms were extended to a mutiny of Coolie passengers.§

And the words capture and seizure are so often used by correct writers and judges, and in legislation, to describe the acts of pirates and of persons acting under *de facto* governments, as to manifest a *jus et norma loquendi.*

Finally. The very question now raised has been fully argued and directly adjudicated in the Supreme Courts of Pennsylvania, Massachusetts, and Maine.‖

We may concede that the United States have never admitted the so-called " Confederate States" to be a government. And this is a matter most proper to be asserted by the United States in its dealings with both its own citizens and foreigners. It may well treat every citizen of the United States who aided in the rebellion as committing treason or piracy; and regard transfers of property, &c., made in virtue of the Confederate laws, and against those of the

---

* Marshall, pt. i, ch. xii, § 3; 1 Phillips, § 1110; 2 Arnould, *808, *811; Benecke, p. 348 (p. 230 of English ed.); Emerigon (by Meredith), 353; 3 Kent's Commentaries, *304; Pothier, Insurance, No. 54; Valin's Commentary, Art. 26, 46; 2 Boulay Paty Commercial Law, § 16, p. 102 (Brussels, 1838.)

† 5 Ellis & Blackburne, 607.          ‡ 1 Ellis & Ellis, 447.

§ And see *Goss* v. *Withers,* 2 Burrow, 694; *McCar* v. *New Orleans Insurance Co.,* 10 Robinson's Louisiana, 202, 334, 339; *Tirrell* v. *Gage,* 4 Allen, 245.

‖ *Fifield* v. *Insurance Co.,* 47 Pennsylvania State, 166; *Dole* v. *Same,* 6 Allen, 373; *Dole* v. *Same,* 51 Maine, 464.

United States, as void.  So in dealing with foreign powers it may properly assert that these did a wrong to us in recognizing the Confederacy as a belligerent power.  But this case raises no such question as any of these.  The fact remains that here was a great power capable of levying war against us, which did so levy and wage war, and which made a capture.  Much of the disquisition by opposing counsel is therefore *from* the purpose.  It has no practical application.

*Reply:* The case of *Powell* v. *Hyde*, the first of the two English cases, relied on by the other side, was that of a " capture " or " seizure," in the usual sense of the words, made by a power authorized to wage war, and then actually waging war.

*Kleinworth* v. *Shephard*, the other English case—the only case in which " seizure" has been said to include acts of individuals not acting under the authority of a recognized government, and in which it was extended by the Court of Queen's Bench to the mutiny by Coolie passengers—was argued before Lord Campbell, Wightman, Crompton, and Hill, JJ., but four of the fifteen English common law judges, none of which four had any peculiar experience or authority in commercial law, and the weight of whose opinion must therefore depend upon the soundness of the reasons assigned for it.  The case, before it is finally disposed of, may be taken to the Court of Exchequer Chamber, if not to the House of Lords, and their decision overruled.  It is hardly in any respect such a decision as should induce this court to go against the recent express decision, in *Swinerton* v. *Columbian Insurance Co.*, of the Superior Court of the City of New York, a tribunal which has long held the position of a very high authority on questions of maritime law ; or against the able decision in the Commercial Court of Bremen, a tribunal in which public law in reference to this class of cases is of necessity very familiar to the court.

Mr. Justice NELSON delivered the opinion of the court.

The question in the case is, whether this taking of the

vessel by the naval forces of the so-called Confederate States was a capture within the warranty of the assured in the margin of the policy? If it was, then the loss is not one of the perils insured against, as the assured, in express terms, had assumed it upon himself.

A capture, as defined by some of the most eminent writers on insurance within the policy, is a taking by the enemy of vessel or cargo as prize, in time of open war, or, by way of reprisal, with intent to deprive the owner of it. This was probably the primary or original idea attached to the term in these instruments. Losses of ships and cargo engaged in commerce by the public enemy were the most to be apprehended and provided against. But usage, and the course of decisions by the courts, have very much widened this meaning, and it now may embrace the taking of a neutral ship and cargo by a belligerent *jure belli;* also, the taking forcibly by a friendly power, in time of peace, and even by the government itself to which the assured belongs.*

Capture is deemed lawful when made by a declared enemy, lawfully commissioned, and according to the laws of war, and unlawful when made otherwise; but, whether lawful or unlawful, the underwriter is liable; the words of the policy being broad enough, and intended to be broad enough, to include every species of capture to which ships or cargo, at sea, may be exposed. Any other rule would furnish but a very imperfect indemnity to the assured if we regard either the character of these seizures and the irregularities attending them, or the trouble, expense, and delay consequent upon the duty or burden of proving in a court of justice the unlawfulness of the act. It is never, therefore, a question between the insurer and the insured whether the capture be lawful or not. The recent case of *Powell* v. *Hyde*† is very decisive on this point. In that case a British ship passing

---

* Phillips on Insurance, §§ 1108–1109; Arnould on Same, 808, 814; 2 Marshall on Same, 495, 496, 507; Powell *v.* Hyde, 5 Ellis & Blackburne, 607.

† Already referred to; 5 Ellis & Blackburne, 607.

down the Danube was fired upon from a Russian fort and sunk. A war existed between Russia and Turkey, but none between the former and Great Britain. The policy of insurance in that case contained the warranty of the assured " free from capture, seizure," &c., upon which the underwriters relied, as here, for a defence. In answer to this it was urged for the assured that these words in the warranty related to a lawful capture or seizure, by a party having authority to make it, and that, inasmuch as the capture was in open violation of law and wholly illegal, it was not within the warranty, and the underwriters were, therefore, liable. But the court held otherwise, and determined that this term in the warranty was not confined to lawful capture, but included any capture, in consequence of which the ship was lost to the insured. This same principle was again deliberately asserted by the court in *Kleinworth* v. *Shepherd.** The same question had been decided many years before by Lord Mansfield in *Berens* v. *Rucker,*† in which he held the insurer liable in case of an illegal capture of a neutral vessel by an English privateer. Chancellor Kent states the rule as follows : "Every species of capture, whether lawful or unlawful, and whether by friends or enemies, is also a loss within the policy."‡ As kindred to this rule is another, that the insurer is liable for a loss by capture, whether the property in the thing insured be changed by the capture or not. In every case of an illegal capture the property is not changed, yet as between, the insurer and the insured, the effect is the same as in case of a capture by an enemy in open war.

In the case of a capture under a commission from an organized government, against an enemy, *jure belli,* to bring the capture within the policy, it is not necessary that the commission should issue from a perfectly lawful government any more than that the capture itself should be lawful. The principle is the same. An illustration will be found in the

---

* 1 Ellis & Ellis, 447.   † 1 Blackstone, 313.

‡ 3 Commentaries, 304–5.

war between Spain and her revolted colonies in South America, which continued for many years. Our government was the first to recognize their independence, which was in 1822; but even down till this event, from the time the revolt had reached the dimensions of a civil war, the government had recognized the war, and conceded equal belligerent rights to the respective parties; and the capture of the vessels of Spain by a commander under a commission by one of the colonies in the exercise of this right, was recognized as legal as if it had occurred in open public war, and, as a matter of course, would have been within the marginal warranty clause of the insured in a policy of insurance. Indeed it has been so held. It will be observed that at this time these colonies had not achieved their independence; they were yet in the heat of the conflict; nor had they been recognized by any of the established governments on either continent as belonging to the family of nations. In this connection it will not be inappropriate to refer to the case of *United States* v. *Palmer,** which was an indictment against the defendant for piracy in the capture of a Spanish vessel under a commission from one of these colonies, and which he set up as a defence. One of the questions certified from the circuit was, whether the seal annexed to the commission purporting to be a public seal used by persons exercising the powers of government in a foreign colony, which had revolted from its allegiance and declared itself independent, but had never been acknowledged as such by the United States, was admissible in a court of the United States as proof of its legal existence with or without proof of its genuineness. The court held that the seal of such unacknowledged government could not be permitted to prove itself, but that it might be proved by such testimony as the nature of the case would admit. The defendant was permitted, also, to prove that he was employed in the service of the colony at the time of making the capture, and which, it was agreed, would constitute a defence to the in-

---

* 3 Wheaton, 610.

dictment for piracy. The proof became necessary on account of the obscurity and unknown condition of this incipient state.

Another illustration will be found in a capture by a *de facto* government, which government is defined to be one in possession of the supreme or sovereign power, but without right—a government by usurpation, founded perhaps in crime, and in the violation of every principle of international or municipal law, and of right and justice; yet, while it is thus organized, and in the exercise and control of the sovereign authority, there can be no question between the insurer and the insured as to the lawfulness of the government under whose commission the capture has been made. If any presumption could properly be indulged as to the perils against which the insured would most desire to protect himself, it might well be captures by these violent and irregularly constructed nationalities. The court in the case of *Nesbitt* v. *Lushington*,* fitly described the character of the government contemplated in the clause respecting the restraints, &c., of kings, princes, or people, namely : " the ruling power of the country," " the supreme power," " the power of the country, whatever it might be,"—not necessarily a lawful power or government, or one that had been adopted into the family of nations.

Now, applying these principles to the case before us, it will be seen that the question is not whether this so-called Confederate government, under whose authority the capture was made, was a lawful government, but whether or not it was a government in fact, that is, one in the possession of the supreme power of the district of country over which its jurisdiction extended? We agree that all the proceedings of these eleven states, either severally or in conjunction, by means of which the existing governments were overthrown, and new governments erected in their stead, were wholly illegal and void, and that they remained after the attempted separation and change of government, in judgment of law,

---

* 4 Term, 763.

as completely under all their constitutional obligations as before.

The Constitution of the United States, which is the fundamental law of each and all of them, not only afforded no countenance or authority for these proceedings, but they were, in every part of them, in express disregard and violation of it. Still, it cannot be denied but that by the use of these unlawful and unconstitutional means, a government, in fact, was erected greater in territory than many of the old governments in Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources, in men and money, to carry on a civil war of unexampled dimensions; and during all which time the exercise of many belligerent rights were either conceded to it, or were acquiesced in by the supreme government, such as the treatment of captives, both on land and sea, as prisoners of war; the exchange of prisoners; their vessels captured recognized as prizes of war, and dealt with accordingly; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded, and the blockade maintained by a suitable force, and duly notified to neutral powers the same as in open and public war.

We do not inquire whether these were rights conceded to the enemy by the laws of war among civilized nations, or were dictated by humanity to mitigate the vindictive passions growing out of a civil conflict. We refer to the conduct of the war as a matter of fact for the purpose of showing that the so-called Confederate States were in the possession of many of the highest attributes of government, sufficiently so to be regarded as the ruling or supreme power of the country, and hence captures under its commission were among those excepted out of the policy by the warranty of the insured.

We could greatly extend the opinion upon this branch of the case by considerations in support of the above view, but the question has undergone very learned and able examinations in several of the State courts, deservedly of the highest

eminence, and which have arrived at the same conclusion, and to which we refer as rendering further examination unnecessary.*

JUDGMENT AFFIRMED.

Dissenting, the CHIEF JUSTICE and Mr. Justice SWAYNE.

NOTE. At the same time with the preceding were argued and adjudged four other cases by the same plaintiff against other insurance companies, all four being adjudged in the same way as the one above reported. In two of them the policies and warranty were in the same language as in that case. In two others there was a difference in the marginal warranty of the insured in this, that while he warranted free from loss or expense by capture, &c., "ordinary piracy" was excepted, so that if the loss was on account of a capture or seizure by pirates, the insured would have been entitled to recover. But NELSON, J., giving the judgment of the court, observed that as the court had arrived at the conclusion that the capture of the vessel was under the authority of a *quasi* government, or government in fact (the ruling power of the country at that time), it was to be held to be within the warranty or exception in the marginal clause. Dissenting, the CHIEF JUSTICE and SWAYNE, J.

---

* Dole *v.* New England Mutual .Ins. Co., 6 Allen, 373; Fifield *v.* Ins. Co., 47 Pennsylvania State, 166; Dole *v.* Merchants' Marine Ins. Co., 51 Maine, 464