## Ex parte NORTON & SHIELDS.

[APPLICATION FOR MANDAMUS TO COMPEL JUDGE OF CITY COURT TO VACATE AND SET ASIDE AN ORDER SETTING ASIDE AND VACATING A JUDGMENT, RENDERED BY IT IN 1865, AND GRANTING A NEW TRIAL THEREIN.]

1. *State, domestic affairs of; by whom controlled.*—The legal, rightful, legislative power of the State, subject to the constitution and laws of the Union, must control the domestic affairs of the State. This power does not exist in the courts of the State, or in any other department of the State government, except the legislative department.

2. *Government de facto, European theory of; how can only be engrafted into our laws.*—It is unwise and dangerous to the peace and safety of the people to attempt to incorporate into our system of laws, except by direct enactment, the European theory of *de facto* governments. No authority is due to the acts of any government in the American Union

which the people have not freely ordained and established, under the authority of the laws and constitution of the Union.

3. *New trials; in what cases can be rightfully authorized.*—The legislative power of the rightful government of the State has the right to authorize the grant of new trials, in judgments rendered in the so-called courts of the insurgent government, existing in this State after the 11th day of January, 1861, and until the complete and full restoration of the loyal, rightful government of the State.

4. *Same; what sufficient cause for granting.*—It is sufficient cause for granting a new trial in a judgment rendered in a court of said insurgent government, that the court which rendered such judgment, was a court created by said insurgent government, and the judge who presided was an officer appointed by said insurgent power ; and that the cause of action was the supposed breach of a warranty of soundness of a person sold as a slave in this State, after the first day of January, 1863 ; that the damages in said judgment were admeasured in Confederate money ; that the defendant was a female and widow, and that the so-called court sat within a city of this State, then occupied as a military post by the insurgent soldiery.

5. *Same; affidavit in support of application for new trial, what notice need not be given in relation to.*—Under ordinance No. 39 of the convention of 1867, and the acts of the legislature, in relation to the granting of new trials, it is not necessary that the parties adversely interested should be notified of the time and place of the taking of the affidavits in support of the application for the grant of a new trial.

This was an application for a writ of *mandamus*, or other appropriate writ or process, to compel Hon. John D. Cunningham, judge presiding in the city court of Montgomery, to vacate and set aside a certain order made by said court, vacating and annulling a judgment rendered in a cause in said court in February, 1865, wherein Norton & Shields were plaintiffs, and Mary C. Pierce, defendant, and granting a new trial therein.

The judgment set aside was rendered in February, 1865, by default, and was based on an action for a breach of warranty of soundness of a slave, sold to the plaintiff in August, 1863.

The affidavit of the defendant, Mrs. Mary C. Pierce, after showing the soundness of the slave at the time of sale, states that the price paid in Confederate currency was not worth more than $400 in lawful currency ; that the damages awarded in the judgment against her amount to $2,464, besides costs, which damages were estimated in Confederate money ; that suit was brought against her shortly be-

fore said slave died, that she is a widow and unacquainted with the proceedings of courts ; and therefore did not have counsel in time to defend said suit, in which judgment by default was rendered against her, and that she did not know that any such judgment had been rendered against her until March, 1868.  Along with this affidavit, others were submitted to prove the soundness of the slave at the time of the sale.  To the introduction of the affidavits, except that of Mrs. Pierce, objection was made, on the ground that said affidavits were *ex parte*, and the plaintiffs in the judgment had no opportunity of cross examining said witnesses.  This objection was overruled, and plaintiffs excepted.

The other facts of the case are set out in the opinion.

ELMORE & GUNTER, *pro* motion.
STONE, CLOPTON & CLANTON, *contra.*

PETERS, J.—This application involves an inquiry into the sufficiency of a judgment purporting to have been rendered by a court of the rebel government having control of the territory of the State of Alabama, during the late insurrection in the Southern States of the Union.  If the court in which this judgment was rendered was a legal tribunal, then its judgment was legal also, and it is entitled to all the protection of a legal adjudication.  But if it was an illegal court, then its judgment was invalid as a judgment.

This court will take judicial notice of the facts which make up the history of the State in regard to the government that may at any time exercise control within its boundaries, whether it be legal or illegal.—*Bank of Augusta v. Earle*, 13 Pet. 519, 590 ; *Taylor v. Barclay*, 2 Sim. 221 ; 1 Greenl. Ev. ch. 2, § 5.  It is then known to this court, that, on the 7th day of January, 1861, a convention assembled in the city of Montgomery, in this State, under authority of a proclamation of the Governor of the State of Alabama, and on the eleventh day of January, of the same year, this body passed an ordinance entitled, " An ordinance to dissolve the Union between the State of Ala-

bama and the other States united under the compact styled
the constitution of the United States of America." This
convention styled itself "a convention of the people of
the State of Alabama." By it the rightful State govern-
ment was overthrown, and a new insurrectionary govern-
ment was set up in its stead.—6 Wall. 13, 14. The chief pur-
pose of this extraordinary movement was to form "a
southern slaveholding Confederacy," in which "no slave"
could "be emancipated by any act done to take effect in
this State or any other country."—Ordn. & Const. of Ala.
1861, article *Slavery*, § 1, part 2, ch. 3, § 2, pp. 106, 111.
The constitution of the new government, thus erected
within the territories of the State of Alabama, purports
to have been "adopted by the people of Alabama, by the
unanimous vote of their delegates in convention assem-
bled, at the capitol, in the city of Montgomery," on the
"twentieth day of March, in the year of our Lord, one thou-
sand, eight hundred and sixty-one, and of the Confederate
States of America, the first year." This new government,
thus established, repudiated any obedience to the govern-
ment of the United States, and assumed a relation of hos-
tility to its constitution and its laws. It took upon itself
also the attitude of a government, independent and for-
eign to the United States, and levied actual war, by mil-
itary force, against this latter government, in order to main-
tain its new position.

Under this insurrectionary organization, all the officers
of the former rightful government of the State of Alabama
were continued in the discharge of the duties and func-
tions of their several offices, as they existed before the
ordinance of secession was passed. The judges and courts
of the rightful State government, after this change, were
incorporated into the new organization as a part of its ad-
ministrative machinery. The courts became a branch of
the insurrectionary government, as much so as any other
department of the rebel organization.—Pamph. Seces. Ordn.
p. 28, No. 16. The courts of the United States were ex-
pelled, and their jurisdiction and dockets transferred to
the courts of the rebel government.—Pamph. Seces. Ordin.
p. 22, No. 14. This new rebel government in the State of

Alabama connected itself with a political organization of other insurrectionary governments in certain other States of the Union, which styled itself, in its constitution and laws, " The Confederate States of America." This latter also claimed to be independent, foreign and hostile to the constitution and government of the United States. —Pamph. Secession Ordin. and Const. of Confederate States, pp. 127, 113, 32. The career of the so-called " Confederate States of America" lasted from the adoption of their provisional constitution, in March, 1861, till May, 1865, when the organization was broken up and dispersed by the military forces of the United States. The rebel government in the State of Alabama, set up by the secession convention of 1861, formed a member of the Confederate States government, during the whole period of its existence, and it was actively engaged in carrying on open and flagrant war against the government of the United States, by all its departments. The courts were empowered and charged to aid the rebellion by giving credit and circulation to the treasury-notes of the so-called " Confederacy," and to punish by their judgments, as felonies, certain acts connected with desertions from the rebel armies.—Pamph. Acts 1861, p. 53, No. 54; Pamph. Acts 1863, p. 13, No. 3, § 7. Thus the courts were as much a part of the machinery of the rebellion as any other department of the insurrectionary administration. They were not the courts of the rightful State government continued under the rule of the *de facto* government of the insurrection, as the English courts were under the reign of Cromwell. But they were organized for unconstitutional and illegal purposes of the most fatal and criminal character. They were not established to prevent anarchy, but to aid the rebellion. They were utterly forbidden by law, and were destructive usurpations of the powers of the rightful government; and their officers and their acts were wholly without any legal warrant, except such as the rightful government might see fit to accord to them, on its restoration. The government, of which they formed a part, was beyond all question illegal in all its departments.—*Texas v. White*, 7 Wall. 700, 732. Admitting, then, as we must admit, that the rebel government, in this

State, was illegal, the fate of the judgments of its courts is most emphatically and correctly declared by Chief-Justice Taney, in the case of *Luther v. Borden.* Contrasting the two governments in Rhode Island, at the date of the Dorr rebellion, in that State, he says : "For if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence, during the time mentioned, if it had been annulled by the adoption of the opposing government, then the laws passed by its legislature during that time were nullities ; its taxes wrongly collected ; its salaries and compensation to its officers illegally paid ; its public accounts improperly settled ; and judgments of its courts, in civil and criminal cases, null and void, and the officers who carried their decisions into operation answerable as trespassers, if not, in some cases, as criminals."— 7 How. 39. This strong expression of opinion no where gives countenance to the pretension that an illegal, insurrectionary government may become legal by assuming a *de facto* character. If any validity is given by the courts to the enactments and judgments of such an illegal government, even when it is not organized for purposes of rebellion, this must be in consequence of subsequent ratification by the rightful, legal government. The acts of the illegal government, however it may be erected, may be ratified ; and they need ratification to make them valid.—*Scott v. Jones,* 5 How. 343, 376, 378 ; 7 How. 55, 56. The better opinion seems to be, that the ratification of a judgment of an illegal and void court can not be accomplished by an act of legislation, because this is a judicial act, and the legislature has no judicial authority.—Cooley on Const. Limit. 107. In this instance, the court that rendered the judgment was illegal and void, and there has been no legal ratification of the judgment, by any authority competent to make it, since it was rendered. The convention that reconstructed and restored the rightful government of the State, refused to make any such ratification, except as shown in ordinance 39, entitled "An ordinance to declare void certain judgments, and to grant new trials in certain cases therein mentioned," passed December 6th, 1867.—

Pamph. Acts 1868, pp. 186, 229. The ordinances of the
convention of the 12th of September, 1865, can not be
regarded as laws, except so far as they have been adopted
or re-enacted by the rightful legislative authority, since the
restoration of the legal government. And this could not
be done, so far as the judgments of the courts of the rebel
government were concerned. There was no authority
vested by law in provisional Governor Parsons to order
the assembling of a convention, and its acts were not ac-
cepted or ratified by the supreme government, and the
whole proceeding was utterly void. A mere convention of
the people, assembled without competent authority, can
neither make laws nor establish lawful governments in the
States or territories of the United States. It requires legal
authority in the first instance, or subsequent legal ratifica-
tion to give such proceedings validity. The power is in
congress to accept and acknowledge the government thus
formed, and in the rightful State authority, on its restora-
tion, to adopt, re-enact and ratify the laws enacted by such
irregular bodies.—*Scott v. Jones*, 5 Howard, 343 ; *Luther v.
Borden*, 7 How. 1, 42, 47, 48, 49 ; Dorr's Trial, pp. 130, 131,
*et passim ;* Cooley, 29, 30, 31 ; 24 Ala. 100. The right to
decide what government in a State or territory of the Union
is the legal rightful government is in congress, and not in
the courts.—7 How. 44, Taney, C. J. And congress has
decided that the proclamation government of this State was
illegal.—Reconstruction Acts 1867, Statutes at Large, pp.
428, 429. This seems to me to be the only correct conclu-
sion that can be drawn from the authorities above cited,
and from the relations of the governments of the States of
the Union to that of the United States.

The granting of new trials is a part of the remedy, and
it is the province of the legislature to prescribe and control
the remedy by law. "And without impairing the obliga-
tion of a contract, the remedy may certainly be modified
as the wisdom of the nation shall direct."—4 Whea. 122.
It is from legislative authority that the court derives its
power to grant new trials in any case. Even where they
have been granted under the practice at common law, it is
because the common law has been adopted by the legis-

lative department of the government.—3 How. 212. It is the purpose of the remedy to aid " the attainment of fair judicial investigation, correct administration of justice, and the just and equable execution of judgments."—*Ex parte* Pollard, 40 Ala. 77, 103. The allowance of a new trial tends to this end, and it does not impair the obligation of the contract on which the judgment is founded. It is permitted simply for the protection of right by " the correct administration of justice." It is impossible that this purpose can impair the obligation of a contract, unless the contract itself is for an unjust purpose, and therefore void. 2 Par. on Contr. p. 746, *et seq*.

Legislation governing the practice in the allowance of new trials can not, therefore, be obnoxious to the objection of unconstitutionality. And in accordance with this view has been the repeated decisions of the highest courts of the Union for many years. In the case of *Sempeyreac & Stewart v. The United States*, (7 Pet. 222,) the courts of the general government, in the territory of Arkansas, were authorized to hear and determine, on bill in chancery, the validity of certain grants of land, made in the territory of Arkansas, acquired by the Louisiana purchase, before that vast tract of country became a part of the United States.

The law of congress conferring this jurisdiction upon the superior courts of the territory of Arkansas, made the decrees of these courts in such cases final, if not appealed from in one year after the same might be rendered. A bill was filed under this law, which was passed in 1824, in the name of Sempeyreac, alleging a grant of a considerable tract of land to him in what is now the State of Arkansas. This grant was confirmed by decree of a court of the territory of Arkansas, at the December term, 1827. Long after this decree was thus rendered, and the right of appeal had been barred by the limitation imposed by this law, a second act of congress was passed conferring jurisdiction on the court, that tried this cause in the first instance, to grant a rehearing on proceedings in the nature of a bill of review, filed or to be filed, for the purpose of revising such decree ; and if it appeared that the court had assumed jurisdiction " on any forged warrant, conces-

sion, or order of survey, or other evidence of title, then, in case of such forgery, to reverse and annul any prior decree or adjudication confirming such claim. This latter act was passed in 1830, some two years after the rendition of said decree in favor of Sempeyreac. Yet, in his case, under the act of 1830 abovesaid, a proceeding in the nature of a bill of review was filed, on the part of the United States, and a new trial was allowed; and the prior decree in favor of Sempeyreac was "reversed, annulled, and held for naught." From this latter decree, an appeal was taken to the supreme court of the United States, where it was objected, that the law of congress of 1830, authorizing the bill of review, was unconstitutional. But this objection was not allowed; because the bill of review was a new remedy, in the nature of a new trial, and the law authorizing it was constitutional. It was also declared that congress, the legislative power, had the right to mould its remedies as it pleased. But had the proceeding been by motion or petition for new trial, which is the usual course in a court of law, the effect would have been precisely the same; and it must have been justified and sanctioned by the same principles which gave validity to a proceeding by bill of review. What would justify the one course would justify the other also. *Ubi eadem est ratio, eadem lex.*— Broom's Max.

In *Calder v. Bull,* (3 Dal. 386,) a like conclusion was reached by the same high tribunal. There, a law of the State of Connecticut set aside a decree of the court of probate, and granted a new trial or rehearing in the same court; and on appeal to the supreme court of the United States; this act was upheld to be constitutional by all the judges. It is also settled by the same authority, that a State legislature has the constitutional right to grant a rehearing, which is the same as a new trial, in its own courts. *Balt. & Susq. R. R. Co. v. Nesbit,* 10 How. 395. These decisions come down to 1850, and, so far as I know, remain unshaken in principle or logic to this day. They fully justify the validity of the ordinance and act of the general assembly, under authority of which the motion for a new

trial of the case at bar was made and granted.   It is true,
that the same supreme court decided, in another case, that
congress can not by law annul a judgment of the supreme
court of the United States, but it is no where intimated that
congress can not authorize the allowance of a new trial in
the national courts at any time it chooses.—18 How. 422.

In the cases above cited, the courts were legal courts and
fully authorized to render the judgments complained of.
They were legal judgments of legal courts.   In the case
at bar, the court was wholly illegal and forbidden by law.
Its judge was an illegal officer, and his exercise of juris-
diction was an usurpation, and he acted in defiance of the
rightful authority.—*Coleman v. Chisholm,* January term,
1869.   The judgment was that of a court of a foreign and
hostile government, which was wholly without acknowledg-
ment of the rightful government.   It is no where settled,
or pretended, that the courts of such a government are en-
titled to have any constitutional protection whatever.   If
the court was clothed with no authority, the judgment is a
nullity.—*Vide Rose v. Himeley,* 4 Cra. 269.   The constitu-
tions, neither of the States nor of the general government,
give protection to the judgments of rebel courts, nor to
their judges.   Then, their judgments are at the mercy of
the rightful authority.   To say that such a court is neces-
sary for the preservation of good order, and to avoid an-
archy, is not enough to surmount the constitutional objec-
tion against them.   All force, whether rightfully or unright-
fully used, relies upon this pretense.   It is the key-note of
all rebellions.   If these tribunals, thus attempted to be set
up, are foreign and wholly unrecognized by the proper po-
litical authority, this fact of their necessity can not be
taken for granted ; it must be proved.   This court has no
right to infer it—that is, their necessity is a fact that must
be proved.

Then, turning to the consideration of ordinance No. 39,
of the convention of this State, of November, 1867, it de-
clares, " that in all cases where judgments or decrees have
been rendered since the 11th day of January, 1861, to this
date, (Dec. 6, 1867,) the party against whom such judg-
ments or decrees have been obtained shall be entitled to a

new trial upon affidavit showing a meritorious defense; *provided*, the court shall be satisfied from all the facts that may be submitted by both parties, that a good and meritorious defense exists."—Pamph. Acts, 1868, pp. 186, 187. The act of October 10, 1868, extends the time of opening such judgments for a new trial, as above said, to the 26th day of June, 1869, and directs that the application for the new trial may be made in vacation, and that it shall be "sustained by affidavit showing probable cause for a meritorious defense."—Pamph. Acts 1868, p. 269, No. 48.

Then, do the facts of this case bring it within the relief of the rule above declared and established, by ordinance No. 39 ? I think they do.

This application for a new trial was made within the time prescribed by law, and in the manner directed by the ordinance and act above referred to. The judgment sought to be opened for a new trial was rendered in a rebel court, as the bill of exceptions and record show, on the 16th day of February, 1865, and " of the independence of the Confederate States of America, the first year." And it is also shown, that the Hon. Benajah S. Bibb was the person who presided as judge of said court. This court was established by the rebel legislature after the secession of the State, by an act which purports to have been approved December 7th, 1863.—Pamph. Acts 1863, p. 121, *et seq.* And the honorable and worthy citizen who acted as such judge was appointed to his office by the rebel authorities. On the motion for new trial, both parties appeared in the court below wherein the application was made, and each filed several affidavits in support of their respective pretensions. Some objection was made by the plaintiffs in the original judgment to the *ex parte* character of a portion of the affidavits filed by Mrs. Pierce. It was objected, that no notice of the time and place of taking these affidavits was given to the adverse party to the motion. The ordinance and act of the legislature, which authorize this proceeding, do not seem to contemplate the necessity of any such notice. The application is simply to be sustained, " by affidavit showing probable cause for a meritorious defense." This showing may be met by similar affidavits or

other testimony submitted by the adverse party. And if the court "is satisfied from all the facts that may be submitted by both parties, that a good and meritorious defense exists," the applicant shall be entitled to a new trial; and it is the duty of the court to grant it. The technical objections to the manner of taking the affidavits of the applicant for a new trial in the court below, were, therefore, properly overruled.

The affidavit of Mrs. Pierce, in support of her application for a new trial, shows that she had not only probable grounds for a meritorious defense, but a sufficient defense to the whole action. The suit against her was based upon a contract of warranty of soundness of a negro man, sold as a slave since the first day of January, 1863. She mentions the transaction as one that had occurred about the 29th day of July, 1863. The record of the judgment shows that it happened on August 13th, 1863. This was after the emancipation of the slaves in this State by the government of the United States. The whole contract of sale and the warranty were void, having been entered into after the person sold had been set free.—*Nelson v. Morgan*, June term, 1869; *Texas v. White*, 7 Wall. 700, 728. It also appears that the sale had been made for a sum in Confederate treasury-notes, which was greatly above their true value in specie, or in any currency of the United States, which would be good as a legal tender for the payment of debts. The court of a government organized to secure the perpetual existence of slavery, and which depended, in a great degree, for its most available resources, for means to discharge its daily expenditures, on the paper issues of its treasury, as notes and bonds, would not have listened to any plea that assailed the institution of slavery, or the value of Confederate money. Yet the proper pleas in this case would have required an allegation that slavery had ceased to exist in this State at the date of the contract forming the basis of the suit, and that the specie or legal currency value of the damages on a broken warranty, was much less than the exorbitant sum adjudged to be due by the judgment complained of, estimated by the Confederate

standard, which had been the measure of the price of the person sold as a slave.—*Fath v. Bliss*, June term, 1869.

The judgment is for twenty-four hundred and sixty-four *dollars*, which means legal money. And it is evident that the damages recovered were estimated by the nominal sum in dollars paid in Confederate money as the price of the person sold as a slave. But this sum was really in Confederate treasury-notes, and was no fair measure of the damages in specie or national currency, which was the only true standard.—*Thorington v. Smith*, U. S. Sup. Court, 1869. And although it is not known to this court that any pleas which involved the existence of slavery, at the date of this sale, and the utter worthlessness of Confederate treasury-notes at the date of the judgment, would have been rejected in the rebel court that tried this cause, yet enough is known to justify the declaration that the interposition of such pleas would not have been a safe proceeding at that date. It is known as a part of the history of the rebellion that the men who were held in bondage were sometimes killed, when they attempted to escape from slavery, to prevent such escape; and that all attempts to impeach the value of what was called "Confederate money" were regarded with very great disfavor by the military authorities of the Confederate States, who really ruled the country quite as they pleased, with but very little regard to the civil authorities, or the rights of the individual citizen. In one or two instances the refusal to accept Confederate treasury-notes, in payment of debts, was made a penal offense, triable by courts martial, by the military edicts of officers high in military authority.—Gen. Bates' order in Alabama; Gen. Van Dorn's order in Mississippi; Gen. Herbert's order in Texas. And though these measures were ordered to be rescinded and abandoned, it was always unsafe to to violate them, near a military post of the rebel government, as would have been the case in this instance. Then, it is almost beyond doubt that the pleas necessary for a legal defense of this action in the rebel court, where it was tried, would not have been permitted to avail as a defense.

I therefore do not doubt, that the facts set forth in the affidavit of Mrs. Pierce, made in support of her application,

which are not successfully controverted, show a good and sufficient defense; and, consequently, the order granting her a new trial was properly made.

The rule for a *mandamus* is therefore denied, at the costs of the applicants for the same.

PECK, C. J., concurred in the result, without assenting to all the reasoning in the opinion.

SAFFOLD, J., not sitting.