JESSE W. BROADWAY v. MELCHER RHEM.

An inhabitant of one belligerent country cannot maintain an action against a soldier of the hostile belligerent for a trespass to the property of the former, done by the soldier in the course of his military duty.

(*Bryan* v. *Walker*, 64 N. C. Rep. 141; *Franklin* v. *Vannoy*, 66 N. C. Rep. 145; *Wilson* v. *Franklin*, 63 N. C. Rep. 259, cited and distinguished from this.)

SETTLE, J. dissenting.

CIVIL ACTION, trespass to personal property, tried before his Honor, *Judge Clarke*, at Fall Term, 1873, of LENOIR Superior Court.

All the facts necessary to an understanding of the case are fully stated in the opinion of the Court.

On the trial below, there was a verdict and judgment for the defendant, from which judgment plaintiff appealed.

*Smith & Strong*, for appellant.

No counsel *contra* in this Court.

RODMAN, J. In 1864, a portion of the army of the United States occupied Newbern and its vicinity, while a Confederate

force occupied the upper country. The plaintiff resided within the Confederate, or at least, without the Northern lines. He left his home so far as appears voluntarily, and went within the Northern lines. While so absent, the defendant, who was a soldier in the Confederate army, by command of his captain, went with another soldier and they seized a mule of the plaintiff which was turned over to the quarter master of the Confederate forces.

The question presented seems to be this : Can an inhabitant of one belligerent country maintain an action against a soldier of the hostile belligerent for a trespass to the property of the former, done by the soldier in the course of his military duty ?

The counsel for the plaintiff who affirm this proposition have not cited an instance of such an action, nor the opinion of any jurist in its favor. Considering the vast number of cases in which such actions might have been brought and would have been, if the proposition could be maintained, the absence of any instance of one must be deemed strong evidence against it.

There are authorities, which if they do not deny the proposition in terms, clearly assume that there is no right of action in such a case.

Kent, 1 Com., 91–'3, says that the general usage in war is to respect private property on land unless in special cases. If a conqueror seizes private property of pacific persons he violates modern usage, " and is sure to meet with indignant resentment, *and to be held up to the general scorn and detestation of the world.*"

The learned writer evidently considers this remote punishment as the only one.

In the case of McLeod, indicted in or about 1840, in a Court of New York, for the burning of the American steamer Caroline, it was considered by the government of the United States (Mr. Webster being Secretary of State,) that after the British government had assumed the responsibility of his act, no action, civil or criminal, would lie against him. Webster's speech on the Ashburton Treaty, Vol. V, of his Speeches, and

Diplomatic Correspondence. It is absurd to suppose that a soldier who in time of war does any act by order of his government within the limits of international law, is subject to any civil responsibility to an enemy injured by the act. Within those limits the soldier is responsible only to his government; the laws are silent in war, not only as to a present remedy, but as to a remedy at any time between individuals of belligerent communities. It is otherwise in the case of a mere riot or insurrection. In such case each rioter or insurgent is criminally liable, and also civilly to all injured by his acts. The decisions of the Supreme Court of the United States sustain these propositions:

1. The Confederate States were a belligerent power.

2. The rights of belligerents are reciprocal and equal during war, and it is indifferent whether the war be between sovereign and independent nations or between powers, one of which claims sovereignty over the other, as is the case in a civil war. If the conflict is recognized as *war* and the rebellious power as a *belligerent*, it is *quoad hoc*, and as regards its belligerent rights on the same footing as an independent nation.

3. A belligerent power may rightfully capture private property on land, at least, if it be of a character to be useful to the enemy.

4. The plaintiff having voluntarily left Confederate territory and gone within the Northern lines, the Confederate government might rightfully regard him as an enemy.

In the Prize Cases, (1862) 2 Black, 635, the Court holds that after the date of the President's proclamations of 27th and 30th April, 1861, proclaiming a blockade of the Southern ports, the Confederate States must be regarded as a belligerent power.

It is not directly said, because it was not necessary to the argument, that the rights of belligerent powers are equal in law. This doctrine results from reason, and is recognized by all writers on the laws of nations.

In consequence of this recognized belligerent position, the United States regarded all persons residing within the Con-

federate lines, or attempting to trade with the Confederates contrary to the proclamation, as in law enemies, without respect to their neutral character or their individual sentiments of friendship to the United States, and upon that ground held it lawful to capture the property of all Southern residents found at sea, and of all neutrals attempting a violation of the blockade. A few extracts will explain the views of the Court.

"The parties belligerent in a *public* war are independant nations. But it is not necessary to constitute war that both parties should be acknowledged as independent nations or sovereign States. A war may exist where one of the belligerents claims sovereign right over the other." "When the parties in rebellion occupy and hold in a hostile manner a certain portion of territory, have declared their independence, have cast off their allegiance, have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents and the contest a WAR."

The Court quotes from Vattel, "Those two parties (those to a civil war,) therefore must necessarily be considered as constituting at least for a time two separate bodies, two distinct societies. Having no common superior to judge between them, they stand in precisely the same predicament as two nations who engage in a contest and have recourse to arms."

The Court thus states the second question in that case as follows: "Is the property of all persons residing within the territory of the States now in rebellion, captured on the high seas to be treated as enemy's property, whether the owner be in arms against the government or not?" "The right of one belligerent not only to coerce the other by direct force, but also to cripple his resources by the seizure or destruction of his property is a necessary result of a state of war." "The produce of the soil of the hostile territory, as well as other property engaged in the commerce of the hostile power, as the source of its wealth and strength, are always regarded as legitimate prize, without regard to the domicil of the owner, and much more so if he reside and trade within their territory." See also Dana's

Wheaton Inter. Law, note 169 to sec. 347, and note 171 to sec. 356.

This decision applied, as will have been seen, only to captures on the high seas. It is stated in text books on international law that the right to capture private property at sea, was a remnant of the barbarous laws of other ages, and that the superior humanity of modern times had abandoned its exercise as to property on land. The acts of Congress, however, of August 6, 1861, of 17th July, 1862, and of March 12th, 1863, do not recognize any such limitation of the right of capture. By this last act it was made the duty of every soldier, &c., to take all "abandoned" property in an insurrectionary district and turn it over to an agent of the U. S. Treasury Department. Under these acts it is well known that if any person, from any cause whatever, was absent from his personal property it was seized as abandoned, without any regard to its character as useful in war or not. Negro women and children, mules, plows, pianos, pictures, sewing machines, and women's dresses were indiscriminately seized and confiscated. The right of the United States to cotton seized under these laws came before the Supreme Court, in the case of Mrs. Alexander's cotton, 2 Wall, 404.

The facts briefly were these: Mrs. Alexander was a widow sixty-five years of age, said to be of infirm health. She resided on her plantation on Red River, and had seventy-two bales of cotton stored in a house about a mile from the river. She was in the Confederate lines until the spring of 1864, when a United States force, under General Banks, went up the river and temporarily drove back the Confederates. During his brief occupation, a force of sailors from a United States gunboat captured the cotton and turned it over to the proper authorities of the United States, when a libel was filed for its condemnation as maritime prize. It is proper to say that Mrs. Alexander was held by the Supreme Court to be disloyal to the United States. The proof on that point was this: as soon as she could, and within three weeks after the seizure of her cotton, she took

the oath of allegiance to the United States. On the other hand it appeared that she had been kind to the soldiers of both armies when they were near her'; she had not successfully resisted the Confederate army when it impressed some of her slaves to work on a fort before the advent of the Northern forces; and some Confederate officers had visited some young ladies at her house; and she *had remained in the rebel territory* after Gen. Banks had retired. Such being the case the Court says "There can be no doubt, we think, that it (the cotton) was enemies property." "This Court cannot enquire into the personal character and dispositions of individual inhabitants of enemy territory." "Being enemies' property, the cotton was liable to capture and condemnation by the adverse party. It is true that this rule as to property *on land* has received very important qualifications from usage, from the reasonings of enlightened publicists, and from judicial decisions. It may now be regarded as substantially restricted to special cases dictated by the necessary operation of the war, and as excluding in general the seizure of the private property of pacific persons for the sake of gain. 1 Kent, 92, 93.

The commanding general must determine in what special cases its more stringent application is required by military emergencies, &c. In the case before us the capture seems to have been justified by the peculiar character of the property, *and by legislation.*"

The capture was held to be lawful, although not a maritime prize, and the proceeds were decreed to be paid into the Treasury of the United States. These doctrines were adhered to in *United States* v. *Klein*, 13 Wall., 128, without any material qualification, although the rule with regard to captured and abandoned property was said to be novel and introduced for the first time in war.

These decisions show that by the law of the United States a capture of property (at least of all such as may be useful to a belligerent) is not unlawful, and preclude the idea that a soldier making such capture under orders from the command-

ing officer and in the course of military duty, can be held liable to an action by the party injured. If it were otherwise, a peace would be impossible. The cessation of the conflict of arms and by organized forces, would be succeeded by conflicts in the Courts even more direful and more fruitful of vindictive feeling. Southern soldiers would be sued for trampling down the grass in Pennsylvania, and Northern ones for doing the same in Georgia. The absurdity and injustice of these results repel the idea that the Courts of belligerent countries can give redress for damages sustained in war. Good policy and the common interests of all sections of a country which has been engaged in a civil war, require that the wounds it has made be healed as speedily as possible, and that the memory of it should pass away.

For these reasons we think the plaintiff cannot recover. Nothing in any previous case before the Court conflicts with what is here said. In *Bryan* v. *Walker*, 64 N. C., 141, the plaintiff was a citizen and resident of North Carolina, and the defendants soldiers of the Confederate States, of which the State was a member. It was not the case of a capture by one belligerent from another. So in *Franklin* v. *Vannoy*, 66 N. C., 145. In *Wilson* v. *Franklin*, 63 N. C., 259, the trespass complained of was committed after the authority of the United States had been fully restored and war had actually ceased.

PER CURIAM.                    Judgment affirmed.