JOHN V. FRANKLIN *vs.* W. W. VANNOY, *et al.*

1. After the rehabilitation of the State, parties who had been arrested as recusant conscripts, had a right of action, against their captors.

2. But such causes of action have been destroyed by virtue of the Amnesty Act of 1866.

3. The seizure of the property of a recusant conscript, at the time of his arrest, is a mere incident to the arrest, and a cause of action therefor, follows the fate of the principal cause, and is likewise, embraced by that Act.

4. The Amnesty Act, thus understood, is not liable to animadversion, as having the effect to divest "vested rights," or otherwise infringe, any provision of the Constitution.

5. During the late rebellion, the Confederate States, and the States composing it, were to all intents and purposes, governments *de facto*, with reference to citizens who continued to reside within the Confederate lines, *hence*, the Confederate States and the acts of its Congress, and the Constitution of the State as then ordained, and the acts of its Legislature; constituted during the continuance of the rebellion, THE LAW OF THE LAND.

6. The scope and effect of the Amnesty Act was to recognize this principle.

7. The Amnesty Act is not only constitutional, but a wise, beneficent and remedial statute, and should be liberally construed, on the maxim *privatum incommodum publico bono pensatur*.

10

JOHN V. FRANKLIN *v.* W. W. VANNOY.

The cases of *State* v. *Blackwood*, *Phil. L.*, 240, and *Black* v. *Jones*, 64 *N. C.*, 318; *Cook* v. *Cook*, *Phil. L.*, 583, cited and approved, and the case of *Bryan* v. *Walker*, 64 *N. C.*, 141, cited, criticised and distinguished.

This was an action in the case commenced under the old system, and tried before His Honor, Judge Mitchell and a jury, at Fall Term 1871, of Iredell Superior Court. The action was brought for the value of a horse, saddle, bridle and pocket-knife.

The plaintiff declared in three counts :

1. In trover.
2. In case for failing to take due care, &c.
3. In trespass, joined under the statute.

It was in evidence, that the plaintiff having become liable during the late rebellion, to military service, reported to the proper enrolling officer, and was by him allowed to join a company, called "Adam's Company," of cavalry, he furnishing his own horse, &c. It was also in evidence that this company were rambling through the country, evading their enforced service, and that a home-guard company, under the command of one Ellis, captured [" Adam's company" as recusant conscripts, and among them the plaintiff, and they took also the plaintiff's horse, saddle, bridle and pocket-knife, and reported to the defendant Finley, who was enrolling officer at Wilkesboro, the captured party, their horses, accoutrements, &c., and that he caused them to be sent forward and reported to his superior officer, Major Burke, the district enrolling officer at Statesville, who caused the plaintiff to be sent on " to the front." The plaintiff's horse was taken back, but it did not distinctly appear what had become of it, nor of the other articles. The defendants were engaged one way or another in the seizure of the plaintiff's property.

There was evidence of a demand for the property, and also of a sale of the horse by, or concurred in by, the defendant Finley.

The plaintiff requested, amongst other instructions, not necessary to be noticed, the following : "that even if the defend-

ant Finley had authority to arrest the plaintiff, it was nevertheless his duty to take reasonable of the plaintiff's property, and if he failed to exercise due care in that regard, and in consequence thereof, the plaintiff lost said property, he is liable in this action for the value thereof." And the same as to each of the other defendants. "That the defendant Finley had no authority to cause the plaintiff's property to be sent to Statesville, and if by reason of his order to that effect, as admitted by him in evidence, the plaintiff lost his property, he is liable for its value." His Honor declined to give these instructions, and instructed the jury, that "if Adam's Company was a regular organization, under military rule, the conduct of the plaintiff had nothing to do with the case, but if the same was not a regular organization, not under military rule, but that they were *evading their duty to their country*, the capture was legal and regular."

Under the charge of His Honor, a verdict was rendered for the defendants, and the plaintiff appealed.

*Fowle* and *Bailey* for the appellant.

1. There was no law of the State or Confederate government, or authority purporting to be a law, which authorized the seizure of this property. *Chap. 3d, Act* 1866–'67. *Bryan* v. *Walker*, 64 *N. C.*, 141.

2. No military officer or subordinate can justify the doing, an illegal act, by producing the order of his superior officers. *Ibid. Wilson* v. *Franklin*, 63 *N. C.*, 259. *Black* v. *Jones*, 64 *N. C.*, 318. *Smith* v. *Stewart*, 21 *La. Am.*, 67. *Echols* v. *Stanton*, 4 *West Va.*, 574. *Furguson* v. *Loar*, 5 *Bush.*, 689. *Witherspoon* v. *Woodey*, 5 *Cold*, 147.

1. Instruction first. (A.) When Finley took possession of the property, he was bound to take reasonble care of it.

Sheriff arrests a man on a horse.

(B.) When he directed the horse, &c., to be sent to Maj. Burke, it was a conversion.

*Espinasse Nisi Prius,* 581.

*Duncombe* v. *Reeve,* Cro. Eliz., *Vol.* 1, 783.

(C.) Having taken possession under a *quasi* legal warrant, he became a trespasser, *ab initio.*

*Six Carpenter's Case.*

*Parrish* v. *Wilhelm,* 63 *N. C.,* 50.

Second instruction. The fact that plaintiff was evading military service in the Confederate army, does not act to create a forfeiture of his property.

*Blackmer* & *McCorkle* and *Armfield* for the appellees.

PEARSON, C. J. At the end of the war, after the State was allowed to enjoy her rights as a member of the Union, and a rightful government was organized, every one who had during the war, been concerned in arresting and sending a recusant conscript to "the front," was liable to indictment, for assault and battery, and was liable to be sued for the arrest and false imprisonment.

If indictments and civil actions had been instituted, for all of these wrongs and injuries, and others of like character, the Courts would have been oppressed with cases. The Judges would have been perplexed with new questions, growing out of the unnatural state of things caused by civil war. Some Judges holding, with His Honor in the Court below, that "recusant conscripts were evading their duty to *their country,*" others holding that the Confederate soldiers were wrong-doers, committing outrages upon the good citizens of the country, and to be treated in the view of the Courts of the rightful government, as violators, of the laws of their country. The result would have been innumerable feuds, so that the country could not have enjoyed, even a partial return to good order and good neighborship, for a generation to come.

Deeply impressed by these considerations, it was deemed wise by the General Assembly, in 1866, to pass what is known

as "the Amnesty Act;" by it, a stop is put to all indictments, and by the 4th section, it is provided : "no person who may have been in the civil or military service of the State, or of the late Confederate States government, or in the service of the U. S. government, shall be held liable in any civil action for any act done in the discharge of any duties imposed upon him by any law or authority, purporting to be a law of the State or of the late Confederate States government."

The first question is, are the defendants embraced by "the Amnesty Act" in regard to this cause of action? The verdict fixes the fact, that the plaintiff and those with whom he had associated himself, were recusant conscripts and deserters from the Confederate service, who had gone from the county of Surry, towards the State of Tennessee, (with an intent to evade military service under the Confederate States, and probably with an intent not to fight on either side,) as far as ten miles above Wilkesboro, whereupon Capt. Ellis, at the head of a Confederate company, with Vannoy and others as "home guards," by the orders of the defendant, Finley, the enrolling officer, stationed at Wilkesboro, captured the plaintiff and his associates, together with their horses and accoutrements, and reported to Finley, who ordered the other defendants to take the men and their horses, &c., and report to Major Burke, who was in command at Statesville. From the instructions asked by the plaintiff, and the instructions given, we infer this was the last the defendants had to do with it ; the plaintiff was ordered to Richmond, and has never recovered, the horse, saddle, bridle and pocket-knife, wherefor he brings his suit.

It is clear, that in regard to the assault and battery, and to the civil action for arrest and false imprisonment, the defendants are embraced by the Amnesty Act. They belonged to the Confederate army, and the "home guard," and made the arrest and did the other acts, in discharge of a duty imposed by an act, purporting to be a law of the State. Also, of an act purporting to be a law, of the late Confederate States. It

would be strange if the plaintiff cannot sue for the injury in seizing him, taking him as a prisoner to Wilkesboro, thence to Statesville, and thence to Richmond, that he can come back and sue for the loss of his horse, saddle, bridle and pocket-knife! The taking and subsequent loss of this property was an incident of the principal act of seizing and taking him off as a prisoner; the greater includes the less—the incident follows the principal : our conclusion is, that the action for the loss of the property, which was a mere consequence of the act of seizing him, is likewise embraced in the Amnesty Act. The words are broad enough to embrace it, and it certainly comes within the mischief intended to be remedied.

The case is not like that put by Mr. Fowle, of a Sheriff, who arrests a man on a horse, and assumes to take care of the horse, and by an abuse becomes a trespass " *ab initio*." For here, the defendants were wrong-doers, from the beginning, both as to the man and his horse, actually and not by relation ; and the Amnesty Act, which relieves them from liability for taking the man, must also relieve them from liability for taking his horse, which was a mere incident or necessary consequence, unless they turned the horse loose in the woods. We are not to be understood, as holding that soldiers can protect themselves for taking private property by the command of an officer, for it is settled to the contrary, *Bryan* v. *Walker*, 64 N. C., 141, where the defendants are made liable for seizing a wagon and two mules, under the orders of a Brigadier General, for the transportation service of the detachment, and it is held, the case was not embraced by the Amnesty Act; for the duty of seizing private property for such a purpose, was not imposed by any law purporting to be a law of the State or late Confederate States, and the General was not warranted by any law in making the order; so, then the order did not protect the defendant, but here, the duty of arresting the plaintiff was imposed by a law purporting to be a law of the State or late Confederate States, and the taking of the horse was an incident which follows

the principal, and is for like reason embraced by " the Amnesty Act." The right of action for the collection of taxes, and the " tenth part of the crops," during the war, was a right of action for an injury to property, and yet this right of action for an injury to property is embraced by the Amnesty Act, by its very terms, for these exactions were made by a law, purporting to be a law of the late Confederate States, so the distinction taken between a right of action for injuries to the person, and a right of action for injuries to property, cannot be supported.

In the second place, had the General Assembly power to pass the Amnesty Act?

It seems to be agreed, that in regard to indictments and civil actions for trespass to the person, the General Assembly had the power. This Court so held in regard to indictments— *Blackwood's case, Phil. L.*, 240—and from the fact that the plaintiff has not sued for the injury to his person, it might be inferred he has been so advised, in regard to the action. But it is insisted that his right of action for loss of property, cannot be taken away, as it is " a vested right" protected by the *Constitution—declaration of rights, sec.* 12.

" No person ought to be taken, imprisoned, or deprived of his freehold, liberty, or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property; except by the law of the land."

The first reflection is : these words extend to liberty, as well as property, and if the General Assembly had power to pass an Amnesty Act in regard to the arrest and imprisonment of the person, why has it not also the power to embrace rights of action for injury to property? If it has not power to do the one, it has not power to do the other, for both are mere rights of action," one for an injury to the liberty of person, the other for an injury to property; let it be remarked, the right of action for the injury to property does not in any way grow out of a contract; the question is not complicated by the learning,

as to " impairing the obligations of contracts." So the right of action for injury to property, stands on the same footing, as the right of action for injury to the person.

The second reflection is : rights of action, both for injuries to person and property at the common law, died with the person, and could not be maintained by, or against the personal representative—otherwise as to a right of action arising in contract, and a right of action *for property* which had been taken in his life time. The plaintiff, after he came back, had a right to sue for his horse, saddle, bridle and pocket-knife, provided he was able to trace the articles or any one of them, no matter how many hands the property had passed through ; for his ownership was not divested. See *Black* v. *Jones*, 64 N. C., 318.

So note the diversity between a right of action for an injury to, or deprivation of the possession of property, and a right of action for the property itself. This proves, that the dictum in *Bryan* v. *Walker*, as to contracts and vested rights, goes a little too far, and fails to note the diversity.

The third reflection is : whatever may be thought of the relations of the Confederate States, and the States comprising it, towards the government of the United States, it is certain that the government of the Confederate States, and of the States comprising it, were, to all intents and purposes, governments *de facto*, in reference to citizens who continued to live in that part of the United States ; so that, the Constitution of the Confederate States and the acts of its Congress, and the Constitution of the State as then ordained and the acts of its General Assembly, constituted and made the " law of the land," during the continuation of the war.

The scope and effect of the Amnesty Act is to make a recognition of this fact, by the rightful government afterwards established, and to give validity to the legislation of the late *de facto* governments, with certain restrictions, and validity was given to the acts of its judiciary, to marriages, and all acts of the kind. *Cook* v. *Cook, Phil.*, 583 ; the whole resting upon broad principles of public policy.

JOHN V. FRANKLIN *v.* W. W. VANNOY.

For these reasons, we declare our opinion to be, that the General Assembly had power to pass the "Amnesty Act," and that it is a wise, beneficent and remedial statute, which ought to be liberally construed, on the maxim, "private right must yield to public good." "It is better that a few should submit to loss than that all should suffer inconvenience." "*Privatum incommodum publico bono pensatur.*" *Broom's Legal maxims.*

In plain English, public policy regards, that the plaintiff and other loyal citizens, whose rights of person and property had been outraged, should submit to the loss, rather than that the country should suffer the " ills untold " which were arrested by " the Amnesty Act."

THERE IS NO ERROR. Judgment affirmed.