FORD *v.* SURGET.

1. The court reaffirms the doctrine in *Williams* v. *Bruffy* (96 U. S. 176), that an enactment of the Confederate States, enforced as a law of one of the States composing that confederation, is a statute of such State, within the meaning of the act regulating the appellate jurisdiction of this court over the judgments and decrees of the State courts.

2. A., a resident of Adams County, Mississippi, whose cotton was there burnt by B., in May, 1862, brought an action for its value against the latter, who set up as a defence that that State, whereof he was at that date a resident, was then in subjection to and under the control of the " Confederate States;" that an act of their congress, approved March 6, 1862, declared that it was the duty of all military commanders in their service to destroy all cotton whenever, in their judgment, the same should be about to fall into the hands of the United States ; that, in obedience to that act, the commander of their forces in Mississippi issued an order, directed to his subordinate officers in that State, to burn all cotton along the Mississippi River likely to fall into the hands of the forces of the United States; that the provost-marshal of that county was charged with executing within it that order; that A.'s cotton was likely to fall into the hands of the United States; that the provost-marshal ordered and required B. to burn it; and that B. did burn it, in obedience to the said act and the orders of that commander and the provost-marshal. *Held*, 1. That the said act, as a measure of legislation, can have no force in any court recognizing the Constitution of the United States as the supreme law of the land. 2. That it did not assume to confer upon

such commanders any greater authority than they, by the laws and usages of war, were entitled to exercise. 3. That the orders, as an act of war, exempted a soldier of the Confederate army who executed them from liability to the owner of the cotton, who, at the time of its destruction, was a voluntary resident within the lines of the insurrection. 4. That the plea should, upon demurrer, be deemed as sufficiently averring the existence of such relations between B. and the Confederate military authorities as entitled him to make the same defence as if he had been such soldier.

ERROR to the Supreme Court of the State of Mississippi.

Ford filed his complaint against Surget in the Circuit Court of Adams County, Mississippi, on the 2d of October, 1866, alleging that he, " at his plantation in said county, on the fifth day of May, in the year 1862, was possessed, as of his own personal property, of two hundred bales of cotton, averaging in weight four hundred pounds per bale, and of the value of $600 per bale; and that he being so possessed, Surget, at the place aforesaid, and upon the day and year aforesaid, did wilfully and utterly, and against the consent and will of the plaintiff, destroy by fire the said two hundred bales of cotton," to the plaintiff's damage in the sum of $120,000.

The defendant pleaded not guilty, and also filed numerous special pleas.

The defence, although presented by the special pleas in different forms, is, in substance, embraced by the following allegations, namely : —

That, at and before the time the alleged trespasses were committed, the people of Mississippi, and of Virginia, North Carolina, South Carolina, Florida, Georgia, Alabama, Louisiana, Arkansas, and Texas, had confederated together for revolt against, and within their territorial limits had entirely subverted, the government of the United States, and in place thereof, and within and for their territory and people, had created a new and separate government, called the Confederate States of America, having executive, legislative, and judicial departments; that on the 6th of March, 1862, and from that date until the time when the alleged trespasses were committed, a war had been, and was then, waged and prosecuted by and between the United States and the Confederate States, and against each other, as belligerent powers and nations; that the Confederate States, for the prosecution of the war and the mainten-

ance of its powers, then and before had maintained in its service, in the State of Mississippi, an army of which General Beauregard was commander, whereby the territory, property, and inhabitants of that State were held in subjection to and under the control of the Confederate States; that on the 6th of March, 1862, and by an act on that day approved and promulgated by the Confederate congress, it was declared to be the duty of all military commanders in the service of the Confederate States to destroy all cotton, tobacco, and other property that might be useful to the forces of the United States, whenever, in their judgment, the same should be about to fall into their hands; that afterwards, on the 2d of May, 1862, General Beauregard, commanding the Confederate forces, in obedience to that act, made and issued a general order, directed to officers under his command in the State of Mississippi and in the service of the Confederate States, to burn all cotton along the Mississippi River likely to fall into the hands of the forces of the United States; that before and at the date last mentioned, and afterwards, until the time the supposed trespasses were committed, Alexander K. Farrar was acting as provost-marshal of the county of Adams, charged with the duty, among others, of executing, within that county, the orders of military commanders in the State of Mississippi in the service of the Confederate States, and in pursuance thereof was commanded by the Confederate military authorities to burn all the cotton along the bank of that river likely to fall into the hands of the forces of the United States; that the cotton in the complaint mentioned was near the bank of the Mississippi within that county, and was, when burned, likely to fall into the hands of the Federal forces: that the defendant was then ordered and required by said Farrar, acting as provost-marshal under the orders aforesaid, to burn certain cotton, including the cotton in controversy; and that afterwards the defendant, in obedience to the act of the Confederate congress, and the orders of said military commanders and provost-marshal, did burn Ford's cotton, which is the supposed trespass complained of.

To each of the special pleas the plaintiff in error demurred, assigning numerous causes of demurrer. The demurrers were

overruled and replications filed. The cause, being at issue, was tried by a jury. Verdict for the defendant. Judgment having been rendered thereon, the plaintiff removed the cause to the Supreme Court of the State. Upon the affirmance of the judgment, he sued out this writ of error.

*Mr. R. D. Mussey* for the plaintiff in error.

This court has jurisdiction. The pleadings draw in question the validity of a statute, set up by the defendant as a justification for his destruction of the plaintiff's property. Its validity, although assailed, upon the ground that its provisions violated rights, privileges, and immunities claimed by the plaintiff under the Constitution of the United States, was sustained by the decision of the court below.

The statute, so far as this case is concerned, derived all its force from the effect given to it as the law of the land in Mississippi, by her solemnly expressed sanction of the acts of the " Confederate States," of which she was a member. It must, therefore, be regarded as her statute, within the meaning of the provision which confers upon this court jurisdiction to re-examine upon error the judgment or decree of a State court. The defendant's attempted justification rests upon two grounds: —

1. An act of the Confederate congress.

The Confederate States were only the military representative of the rebellion, and were never recognized by the United States as a *de facto* government. Their enactments are, therefore, absolute nullities, and cannot be pleaded as a justification for the wrongful act of Surget. *Hedges* v. *Price et al.*, 2 W. Va. 234; *Caperton* v. *Martin*, 4 id. 38; *Franklin* v. *Vannoy*, 66 N. C. 145; *The Sequestration Cases*, 30 Tex. 688; *Reynolds, Auditor*, v. *Taylor*, 43 Ala. 434; *Keppel's Adm'rs* v. *Petersburg Railroad Co.*, Chase's Decisions, pp. 209, 210; *United States* v. *Morrison*, id. 525; *Evans* v. *City of Richmond*, id. 551; *Texas* v. *White*, 7 Wall. 700; *Horn* v. *Lockhart*, 17 id. 570; *Sprott* v. *United States*, 20 id. 459.

2. Belligerent rights.

The Confederate forces had no rights other than those expressly granted them; and hence it is incumbent on the defendant to aver that the precise belligerent right set up by him as a justification had been granted. Such averment is wanting

in his pleas. No such right as is invoked in the argument was ever granted by the United States to the insurgents, by any proclamation, order, or statute. The courts are concluded in this respect by the action of the political department. They cannot supplement or extend the grant.

This court, in passing upon such rights, has carefully excluded any enlargement of them, and confined itself to the definition of what was actually given. See, for instance, *Coppel v. Hall*, 7 Wall. 554.

Conceding that the orders in question were lawfully issued, they can only justify the military man who executed them.

It is not averred that the defendant had any allegiance to the Confederate forces as a volunteer or a conscript, or that there was any *vis major* compelling him to obey the orders.

It is even denied, by high authority, that an act of a Confederate soldier, committed in violation of private rights as well as of public duty, can find a justification in the order of his commanding officer. *Hedges* v. *Price et al.*, 2 W. Va. 234; *Caperton* v. *Martin*, 4 id. 138; *Franklin* v. *Vannoy*, 66 N. C. 145.

But be this as it may, the exemption from individual and personal liability does not extend to a citizen who, not directly connected with the Confederate forces, committed acts of private wrong in aid of the rebellion. *Cochran & Thompson* v. *Tucker*, 3 Cold. (Tenn.) 186; *White* v. *Hart*, 13 Wall. 646, 651; *Sprott* v. *United States*, 20 Wall. 459, 465.

*Mr. W. T. Martin* for the defendant in error.

A preliminary question of jurisdiction arises. To give jurisdiction here, it must affirmatively appear from the record not only that a Federal question was raised, but that it was actually decided, or that the judgment as rendered by the State court could not have been given without deciding it. *Brown* v. *Atwell*, 92 U. S. 327; *Armstrong et al.* v. *Treasurer of Athens County*, 16 Pet. 281; *Bridge Proprietors* v. *Hoboken Company*, 1 Wall. 116; *Murdoch* v. *City of Memphis*, 20 id. 590; *Railroad Company* v. *Maryland*, id. 643; *Cockroft* v. *Vose*, 14 id. 5.

If the judgment might have proceeded upon some ground of general law, independently of the Federal question, the juris-

diction fails. *Klinger* v. *Missouri*, 13 Wall. 257 ; *Commercial Bank* v. *Rochester*, 15 id. 639 ; *Rector* v. *Ashly*, 6 id. 142 ; *Gibson* v. *Choteau*, 8 id. 317 ; *Steines* v. *Franklin County*, 14 id. 15 ; *Kennebeck Railroad* v. *Portland Railroad*, id. 23 ; *Caperton* v. *Boyer*, id. 216.

A plea of not guilty, and several special pleas all ultimately leading to issues of fact, were filed. The jury found for the defendant, and judgment was rendered in his favor. There was no bill of exceptions embodying the evidence or the instructions of the court. The judgment of the Supreme Court, affirming, in general terms, that of the subordinate court, having been, for aught that the record discloses, rendered irrespectively of any matter of law which might have been raised upon the special pleas, presents nothing which justifies the conclusion that a Federal question was actually decided. Neither the published opinion of the Appellate Court, nor the assignment of errors there filed, constitutes a legitimate part of the record ; and, therefore, although incorporated in it, furnishes no aid in determining whether jurisdiction exists here. *Medberry et al.* v. *State of Ohio*, 24 How. 413.

So far as the record is concerned, the whole case may have turned solely upon the insufficiency of the evidence to maintain the issue for the plaintiff upon the plea of not guilty.

If, however, this court takes jurisdiction, and considers that the validity of the special pleas is a subject of discussion here, it is submitted that they are sufficient to bar the action.

The property of the plaintiff alleged to have been destroyed . at his residence in Mississippi, May 5, 1862, was cotton, an article which each belligerent regarded as possessing a special character, and treated, even in the hands of non-combatants, differently from ordinary private property. " It is well known," said this court in *Mrs. Alexander's Cotton* (2 Wall. 420), " that cotton has constituted the main reliance of the rebels for ·means to purchase the munitions of war in Europe. It is a matter of history, that, rather than permit it to come . into possession of the national troops, the rebel government has everywhere devoted it, however owned, to destruction." The regulations established by the Federal government, the

acts of its officers, — military, naval, civil, — and the decisions of its courts, show what importance it attached during the war to that species of property, and how it would be disposed of if found in the hands of a resident of a State in rebellion. It was treated by the respective belligerents as contraband of war, and was by each the subject of special governmental con trol and action, whether for its preservation, seizure, confisca· tion, or destruction.

The Confederate States, in prosecuting the war, had the right to destroy such property found within the limits of their military occupation, in order to prevent its seizure by the United States. Being a *de facto* government, its statutes and orders must have been necessarily obeyed by all persons residing within those limits. By acts of obedience in submission to a power which they could not resist, such persons did not become responsible as wrong-doers. *Thorington* v. *Smith*, 8 Wall. 1, citing *United States* v. *Rice*, 4 Wheat. 246, and *Fleming* v. *Page*, 9 How. 603.

The plaintiff insists that the statute in question was a nullity, having no binding force in law; that the Confederate States were founded upon an usurpation of the authority and jurisdiction of the United States, and were not recognized by the latter even as a *de facto* government.

The authorities are not consistent upon the subject. While, therefore, a decree confiscating the property of a non-resident of the Confederate States, or sequestering a debt due to him or to the United States, would, although rendered in accordance with a statute, be held inoperative to pass the title to the property or to extinguish the debt, no decision can be found affirming that, in such a case as this, the statute in question would not afford a complete justification to the defendant.

In 1862 the war was in progress. Ford and Surget resided in Mississippi, and were there justly regarded and treated as having, by their own voluntary act, rendered themselves subject to the Confederate government. They were alike in rebellion, and in its cause risked person and property. The rebels, as between themselves, or as between themselves and the Confederate government, must be held to have acquiesced

in its authority, and to have incurred no liability by rendering obedience to its enactments.

Ford was, in judgment of law, a party to the acts of that government. 1 Kent, 63. He might perhaps have claimed compensation from it if the rebellion had been successful, but certainly not from Surget, acting under its order. They, and many thousands besides, established and recognized it as the government of their choice. It has perished; and Ford now asks that Surget be compelled to indemnify him for losses he sustained in their common attempts to maintain it and displace the authority of the United States. No court will sanction such an unreasonable and unjust demand. Vattel (ed. 1855), 402, sect. 232.

But rejecting as surplusage the allegation of the pleas touching the statute, they are a valid bar. The United States, from sound policy as well as humanity, conceded to the organized military forces of the Confederate States the same status and rights as if they had been engaged in warfare on behalf of a lawfully existing and independent power. The Federal army, in extending its sphere of successful operations, seized all cotton found within the insurgent States, and the proceeds of the sales of that species of property were paid into the treasury. The United States thus increased its resources for the prosecution of the war. Wherever, therefore, such property was liable to capture by that army, the Confederate commanders, in the absence of any statute of their government on the subject, had, by the laws of war, the same right to destroy it as if it had formed part of their public stores or munitions of war. The history of that eventful period renders it certain that the orders in the pleas mentioned would, at every hazard, have been carried into execution.

It is said, however, that Surget does not aver that he was in the military service. The allegation is that the provost-marshal was charged with the execution of those orders, and that by him Surget " was ordered and required to burn " the cotton for the loss of which this suit was brought. He was, therefore, subjected to the military power, and his obedience to its commands would have been undoubtedly enforced by the same

means of coercion as if he had been an enlisted soldier. The doctrine of *vis major*, therefore, applies.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

We can notice only the ground of demurrer, which suggests that the defendant in his pleas sought to rely "for justification of the trespass committed by him upon matters in themselves wholly illegal, against peace and good policy, and contrary to the Constitution of the United States, the supreme law of the land, and the government thereof."

In view of the decision in *Williams* v. *Bruffy* (96 U. S. 176), but little need be said upon the preliminary question of the jurisdiction of this court. What is there decided would seem to be conclusive, in this case, upon the point of jurisdiction. That was an action of assumpsit for goods sold in March, 1861, by citizens of Pennsylvania to one Bruffy, a citizen of Virginia. The administrator of Bruffy claimed that the estate was not liable for the debt sued for, because, pending the recent war, his intestate paid the debt to a receiver of the Confederate States, in pursuance of a decree of a Confederate district court in Virginia, rendered in conformity with the provisions of an act of the Confederate congress, passed Aug. 30, 1861, sequestrating the lands, tenements, goods, chattels, rights, and credits within the Confederate States, and of every right and interest therein, held by or for any alien enemy after May 21, 1861. That defence was sustained in the State courts, and, upon error, it was insisted that this court had no jurisdiction to review the final judgment of the Supreme Court of Appeals of Virginia. Referring to the provision in the statute conferring appellate jurisdiction upon this court, " where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of their validity; " and referring also to the provision conferring such jurisdiction, " where any title, right, privilege, or immunity is claimed under the Constitution, or any treaty or statute of, or commission held or authority exercised under, the United States, and the

decision is against the title, right, privilege, or immunity specially set up or claimed by either party under such Constitution, treaty, statute, commission, or authority," — this court decided that its right to review that judgment could be maintained upon both of those clauses of the amended Judiciary Act.

Some of the grounds of our decision are thus stated in the opinion of the court : —

" The pleas aver that a confederation was formed by Virginia and other States, called the Confederate States of America, and that under a law of this confederation, enforced in Virginia, the debt due to the plaintiffs was sequestrated. Now, the Constitution of the United States prohibits any treaty, alliance, or confederation by one State with another. The organization whose enactment is pleaded cannot therefore be regarded in this court as having any legal existence. It follows that whatever efficacy the enactment possessed in Virginia must be attributed to the sanction given to it by that State. Any enactment, from whatever source originating, to which a State gives the force of law, is a statute of the State, within the meaning of the clause cited relating to the jurisdiction of this court. . . . By the only authority which can be recognized as having any legal existence, that is, the State of Virginia, this act of the unauthorized confederation was enforced as a law of the commonwealth. Its validity was drawn in question on the ground that it was repugnant to the Constitution of the United States, and the decision of the court below was in favor of its validity."

We do not perceive that this case, upon the question of jurisdiction, can be distinguished from *Williams* v. *Bruffy.* The defendant, Surget, justifies his burning of the cotton under military orders, issued by a Confederate general, in pursuance of authority conferred by an act of the Confederate congress. If we regard substance rather than mere form or technical accuracy, the defence rested upon that act, the validity of which was, in terms, questioned by the several demurrers to the special pleas. The general orders of the State court overruling the demurrers must be accepted, in every essential sense, as an adjudication in favor of the validity of an act of the Confed-

erate congress, recognized and enforced as law in Mississippi, and which act, according to the rule laid down in that case, must be, therefore, regarded by us as a statute of that State, within the meaning of the provisions of the act declaring the appellate jurisdiction of this court. It results that we have power to review the final judgment of the Supreme Court of Mississippi.

We come now to the consideration of the merits of the case, so far as they seem to be involved in the demurrers to the special pleas.

The principles of public law, as applicable to civil and international wars, have been so frequently under discussion here, that we shall not avail ourselves of the opportunity now afforded to renew that discussion, or enlarge upon what has been heretofore said. The numerous decisions of this court, beginning with the *Prize Cases* (2 Black, 635), and ending with *Williams* v. *Bruffy (supra)* and *Dewing* v. *Perdicaries* (96 U. S. 193), render any further declaration as to these principles wholly unnecessary for the purposes of the present case. Without attempting to restate all the reasons assigned in adjudged cases, for the conclusions therein announced, we assume that the following propositions are settled by, or are plainly to be deduced from, our former decisions : —

1. The district of country declared by the constituted authorities, during the late civil war, to be in insurrection against the government of the United States, was enemy territory, and all the people residing within such district were, according to public law, and for all purposes connected with the prosecution of the war, liable to be treated by the United States, pending the war and while they remained within the lines of the insurrection, as enemies, without reference to their personal sentiments and dispositions.

2. There was no legislation of the Confederate congress which this court can recognize as having any validity against the United States, or against any of its citizens who, pending the war, resided outside of the declared limits of the insurrectionary districts.

3. The Confederate government is to be regarded by the

courts as simply the military representative of the insurrection against the authority of the United States.

4. To the Confederate army was, however, conceded, in the interest of humanity, and to prevent the cruelties of reprisals and retaliation, such belligerent rights as belonged under the laws of nations to the armies of independent governments engaged in war against each other, — that concession placing the soldiers and officers of the rebel army, as to all matters directly connected with the mode of prosecuting the war, " on the footing of those engaged in lawful war," and exempting " them from liability for acts of legitimate warfare."

5. The cotton for the burning of which damages are claimed in this civil action was, as to the United States and its military forces engaged in the suppression of the rebellion, not only enemy, but hostile property, because being the product of the soil, and, when burned, within the boundary of the insurrectionary district, it constituted also, as we know from the history of the insurrection it did, " the chief reliance of the rebels for means to purchase the munitions of war in Europe." *Young* v. *United States, supra,* p. 39 ; *Mrs. Alexander's Cotton,* 2 Wall. 404. It was therefore liable, at the time, to seizure or destruction by the Federal army, without regard to the individual sentiments of its owner, whether the purpose or effect of such seizure or destruction would have been to strengthen that army, or to decrease and cripple the power and resources of the enemy.

It would seem to be a logical deduction from these doctrines — a deduction strengthened by considerations of humanity and public necessity — that the destruction of the same cotton, under the orders of the Confederate military authorities, for the purpose of preventing it from falling into the hands of the Federal army, was, under the circumstances alleged in the special pleas, an act of war upon the part of the military forces of the rebellion, for which the person executing such orders was relieved from civil responsibility at the suit of the owner voluntarily residing at the time within the lines of the insurrection. We do not rest this conclusion upon any authority conferred or attempted to be conferred upon Confederate commanders by the statute of the Confederate congress, recited in

the special pleas. As an act of legislation, that statute can have no force whatever in any court recognizing the Federal Constitution as the supreme law of the land. It is to be regarded as nothing more than a declaration upon the part of the military representative of the rebellion, addressed to Confederate commanders, affording evidence to those adhering to the rebellion of the circumstances under which cotton within the lines of the insurrection might be destroyed by military commanders in the service of the Confederate States. It, however, assumed to confer upon such commanders no greater authority than, consistently with the laws and usages of war, they might have exercised, without the previous sanction of the Confederate legislative authorities, as to any cotton within their military lines likely to fall into the hands of the Federal forces. They had the right, as an act of war, to destroy private property within the lines of the insurrection, belonging to those who were co-operating, directly or indirectly, in the insurrection against the government of the United States, if such destruction seemed to be required by impending necessity for the purpose of retarding the advance or crippling the military operations of the Federal forces. Of that mode of conducting the war, on behalf of the rebellion, no one could justly complain who occupied the position of an enemy of the United States, by reason of voluntary residence within the insurrectionary district.

It is insisted with much earnestness that Surget should not be allowed to take shelter under these doctrines, since it is not averred in the special pleas that he constituted any part of, or held any official relations to, the military forces of the rebellion. But such a technical, narrow construction of the special pleas should not be allowed to prevail in a case like this. It is distinctly alleged that the Confederate government was, at the time of the burning of the cotton, exercising all the functions of civil government within the State of Mississippi, and over its property and inhabitants. It is further alleged that the defendant was an inhabitant and citizen of Mississippi, subject to Confederate power, authority, and jurisdiction, and that he was ordered and required by the provost-marshal — charged by the Confederate department commander with the execution of

the order to burn the cotton in Adams County likely to fall into the possession of the Federal forces — to burn the cotton on Ford's plantation, and that it was so burned in obedience to the act of the Confederate congress and the orders of the military authorities.  These allegations seem to be sufficiently comprehensive to admit evidence that the defendant[1] acted under duress or compulsion.  Taking into consideration the extraordinary circumstances in which the people of Mississippi were then placed, especially the absolute authority which the Confederate government and its military commanders were then exercising over that portion of the territory and people of the United States, the special pleas should be deemed, upon demurrer, as sufficiently averring the existence of such relations between Surget and the Confederate military authorities as entitled him to make the same defence as any soldier, regularly enlisted in the Confederate army, acting under like orders, could have made.  Whether Surget was, in fact, required to execute the order of the provost-marshal does not appear.  No bill of exception was taken, and in view of the explicit averment that Surget was required by military authority to burn Ford's cotton, we cannot assume upon demurrer that he was a mere volunteer to aid in its destruction.

It will be observed that we have assumed, from the pleadings, as we think we are justified in doing, that Ford resided on his plantation in the insurrectionary district at the time his cotton was burned.  The contrary is not alleged, and was not claimed in argument.  He does not pretend that he resided in a loyal State, or adhered to the government of the Union in its efforts to suppress the rebellion.  There is no intimation that his residence in Mississippi was, in any degree, constrained or temporary.  Whether the redress here sought could, consistently with the provisions of the Federal Constitution, be denied to one who, by the laws of war, is to be deemed an enemy to the lawful government, solely by reason of residence within the insurrectionary district pending the struggle, but who, in point of fact, was a loyal citizen, adhering to the United States, giving no voluntary aid or comfort to the rebellion, it is not necessary for us now to decide.  No such question is here presented, and we forbear any expression of opinion upon it.  It will be

time enough to consider and determine that precise question when it arises.

Our conclusion, therefore, is that the act of the Confederate congress, recited in the special pleas, was of no validity as an act of legislation ; and while the demurrers could not have been overruled upon the ground that such unauthorized legislation afforded protection to Surget, nevertheless, the general facts set out in the special pleas, considered in connection with the belligerent rights conceded to the rebel army by the government of the United States, do constitute a defence to this action, and upon this last ground the demurrer might have been properly overruled.

Whether the State court, in its instructions to the jury, correctly expounded the law of the case, we cannot, upon this review, determine. No bill of exception was taken, either as to the evidence or the instructions, and we cannot, therefore, determine what errors, if any, were committed in the trial of the case. We have limited our investigation altogether to the Federal questions raised by the demurrer to the special pleas.

*Judgment affirmed.*

MR. JUSTICE CLIFFORD concurred in the judgment of the court, and delivered the following opinion : —

Parties belligerent in a public war are independent nations; but it is not necessary that both parties should be acknowledged as such in order to the enjoyment of belligerent rights, as war may exist where one of the belligerents claims sovereign rights against the other, the rule being, that when the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be open, civil war exists, and hostilities may be prosecuted to the same extent as in public war. *Prize Cases*, 2 Black, 666 ; Vattel, 425.

Two hundred bales of cotton owned by the plaintiff were burned by the defendant, during the war of the rebellion, at the time and place alleged in the declaration; and the plaintiff, since the restoration of peace, instituted the present action of trespass, in the State court, to recover damages for the loss. Service was made, and the defendant appeared and pleaded the general issue and several special pleas.

Reference need only be made to two of the special pleas: 1. That the defendant burned the cotton in obedience to an order of the Confederate States, given through the commanding general of their army and the acting provost-marshal of the county. 2. That the Confederate congress passed an act that it should be the duty of all military commanders in the service of the Confederate States to destroy all cotton, tobacco, or other property that might be useful to the enemy (meaning the military forces of the United States), whenever in their judgment the same should be about to fall into their hands, and that the defendant burned the cotton in litigation in pursuance of that act and the said orders of the said military commander and provost-marshal. .

Suffice it to say, in this connection, the plaintiff demurred to all the special pleas; and the subordinate court overruled the demurrers, and the parties went to trial. Hearing was had before the jury, and they returned a verdict in favor of the defendant. Judgment was accordingly rendered upon the verdict; and the plaintiff removed the cause to the high court of errors and appeals of the State, where the parties were again heard, and the State appellate court affirmed the judgment of the court of original jurisdiction. No exceptions were filed by the plaintiff in either of the subordinate courts, but he sued out the present writ of error, and removed the cause into this court.

Since the case was entered here, the plaintiff assigns the following errors: 1. That the Supreme Court of the State erred in sustaining the Circuit Court in overruling the demurrers of the plaintiff to the special pleas filed by the defendant. 2. That the Supreme Court of the State erred in refusing to grant certain instructions to the jury, which cannot be considered, it not appearing that there was any trial by jury in the Supreme Court; nor would either party be benefited if it were otherwise, as all the material questions presented for decision in the prayers for instruction are involved in the rulings of the court in overruling plaintiff's demurrers to the defendant's special pleas.

Insurrection may or may not culminate in an organized rebellion, and it may or may not assume such aggressive

proportions as to be justly denominated territorial war, the universal rule being that rebellion becomes such, if at all, by virtue of its numbers and the organization and power of the persons who originate it and are engaged in its prosecution. But when the party in rebellion hold and occupy certain portions of the territory of the rightful sovereign, and have declared their independence, cast off their allegiance, and formed a new government, and have organized armies and raised supplies to support it, and to oppose, and if possible to destroy, the government from which they have separated, the world and the law of nations acknowledge them as belligerents engaged in civil war, because they claim to be in arms to establish their liberty and independence in order to become a sovereign State.

History furnishes many examples of war between the government *de jure* of a country and a government *de facto* of a seceding portion of the same country ; and in such cases jurists hold that other powers are entitled to remain indifferent spectators of the contest, and to allow impartially to both belligerents the free exercise of those rights which war gives to public enemies against each other, such as the right of search, the right of blockade, the right of capturing contraband of war and enemy's property laden in neutral vessels. Twiss, Law of Nations (2d ed.), sect. 239.

Rebellions of the kind, when they become too formidable to be suppressed by the duly constituted civil authorities, authorize the *de jure* government to blockade the ports within the territory occupied by the insurgents, and to notify the same to foreign powers that the same will be enforced pursuant to the law of nations. Official notice of such a proclamation makes it the duty of foreign nations to conform to the international rules of war in that regard ; and the same jurist says that the foreign power must at once decide upon one of three alternative courses of action. It may assist the government *de jure* as an independent power, or it may assist the insurgents, in either of which cases it becomes a party to the war ; or it may remain impartial, still continuing to treat the government *de jure* as an independent power, whilst it treats the insurgents as a community entitled to the rights of war against its adversary. Such a concession is indispensable, as the neutral power will

find it impossible to recognize the character of one as a belligerent without recognizing the belligerent character of the other, unless the war is confined entirely within the territory of the contending parties and does not extend in any respect to the highway of nations.   Id. p. 500.

Belligerents engaged in war may exercise the right of blockade, and they may capture contraband of war and enemies' property laden in neutral vessels; and if so, the contest, though it originated in rebellion, must in the progress of events, when it assumes such proportions as to be justly denominated civil war, be recognized as entitling both parties to the rights of war just as much as if it was waged between two independent nations.

Lawful blockade can only be established by a belligerent party, the rule being that a neutral country has a right to trade with all other countries in time of peace, and when in time of war the right is subjected to the conditions or restrictions resulting from blockade, the interruption of the untrammelled right can only be justified because the party imposing the conditions and restrictions is invested with belligerent rights under the law of nations.  *Ex parte Chavasse, In re Grazebrook,* 4 De G., J. & S. 655; *The Helen,* Law Rep. 1 Ad. & Ec. 1; DeBurgh, Marine Int. Law, 123; *The Trinidad,* 7 Wheat. 340.

Independent powers at war may seize and confiscate all contraband goods, without any complaint on the part of the neutral merchant; and that right is conceded even when one of the parties is not acknowledged as a *de jure* government, in case of insurrection, where the contest has assumed such proportions as justly constitute it a civil war in the international sense.   1 Kent, Com. (12th ed.) 92.

Other nations as well as the United States conceded belligerent rights to the Confederate States, as all admit, which renders it unnecessary to inquire whether the concession was rightful or premature.   Matters to be taken into the account in determining such a question, it is said, are whether the insurgents present the existence of a *de facto* political organization, sufficient in character, population, and resources to constitute it, if left to itself, a State among the nations reasonably capable of discharging the duties of such an organization.

Due weight should be given to the then existing character of the actual conflict, having respect to the military force on each side and the action of the parties in conducting military operations against each other; as whether or not they conduct such operations in accordance with the rules and customs of war, as by the use of flags of truce, cartels, and exchange of prisoners, and whether the parent State treats captured insurgents as prisoners of war. Inquiry may also properly arise whether the insurgents have employed commissioned cruisers at sea, and whether the rightful government has exercised the right to blockade the ports of the insurgents against neutral commerce, and that of stopping and searching neutral vessels engaged in maritime commerce. If all these elements exist, says Dana, the condition of things is undoubtedly war, and it may be war before they are all ripened into activity. Dana's Wheaton, p. 34, note.

Apply those rules to the case, and it is as clear as any thing in legal decision can be, that the Confederate States were belligerents in the sense attached to that word by the law of nations. During the military occupation of the territory within the Confederate lines the sovereignty of the United States was so far suspended, that the Federal laws could no longer be enforced there, and the inhabitants passed under a forced allegiance, and were bound by such laws as the usurping government saw fit to recognize and impose. *United States* v. *Rice*, 4 Wheat. 254.

Civil war, says Vattel, breaks the bands of society and government, or at least suspends their operation and effect; for it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as thenceforward constituting, at least for a time, two separate bodies, two distinct societies. Though one of the parties may have been to blame in breaking the unity of the State and resisting the lawful authority, they, the two parties, are not the less divided in fact. . . . They stand, therefore, in precisely the same predicament as two nations who engage in a contest, and being unable to come to an agreement have recourse to arms.

Publicists and courts of justice everywhere concur in these sentiments, and in certain corollaries which the author deduces from the attending circumstances; to wit, that the common laws of war — those maxims of humanity, moderation, and justice previously pointed out — ought to be observed by both parties in such a conflict.    Vattel, 425.

For the same reasons which render the observance of those maxims a matter of obligation between State and State, it becomes equally and even more necessary in the unhappy circumstance of two incensed parties in the case of civil war. Should the sovereign conceive that he has a right to hang up his prisoners as rebels, the opposite party will make reprisals, as in the example given in the note, and if he does not observe the terms of the capitulations and all other conventions with his enemies, they will no longer rely on his word.    Should he burn and ravage, they will follow his example, and the war will become cruel, horrible, and every day more destructive to the nation.

War, it is said, may exist without a formal declaration; and the decision of the court is, that the laws of war as established among nations have their foundation in reason, and tend to mitigate the cruelties and miseries which such conflicts produce.    *Prize Cases*, 2 Black, 669.    Hence, say the court, the parties to a civil war usually concede to each other belligerent rights, for they exchange prisoners, and adopt the other courtesies and rules common to public or national war; nor is it necessary that the independence of the revolted province or State should be acknowledged in order to constitute it a party belligerent in a war, according to the law of nations; and the reason given for the rule is one of frequent illustration, which is, that foreign nations acknowledge it as war by a declaration of neutrality, of which two examples are given in the opinion of the court from which these rules are drawn.    1. When the United States recognized the existence of civil war between Spain and her colonies.    *The Trinidad*, 7 Wheat. 327. 2. When the Queen of England issued her proclamation of neutrality recognizing hostilities as existing between the United States and the Confederate States.

Other nations followed with a similar declaration or by silent

acquiescence; and in speaking of that fact this court say, that a citizen of a foreign State, in view of such a recognition, is estopped to deny the existence of a war, with all its consequences as regards neutrals. They cannot ask a court to affect a technical ignorance of the existence of a war which all the world acknowledges to be the greatest civil war of the human race, and thus cripple the arm of the government and paralyze its power.

Such a war usually operates as a temporary suspension of obedience of the revolting party to the lawful sovereign; but other nations may, until the revolution is consummated, remain indifferent spectators of the controversy, treating the government as sovereign and the new government as a society entitled to the rights of war against its enemy, or they may espouse the cause of the party which they believe to have justice on its side. In the first case, the foreign State fulfils all its obligations under the law of nations, and neither party has any right to complain, provided that it maintains an impartial neutrality; but in the latter case, the foreign State becomes the enemy of the party against which it declares, and the ally of the other. Lawrence's Wheaton, 40, and notes.

Belligerent rights cannot be exercised when there are no belligerents. Conquest of a foreign country, if permanent, gives absolute and unlimited right; but no nation can make such a conquest of its own territory. If a hostile power, either from without or within a nation, takes possession and holds absolute dominion over any portion of its territory, and the nation by force of arms expels or overthrows the enemy and suppresses hostilities, it acquires no new title, but merely regains the possession of what it had been temporarily deprived. Id. 605; *The Amy Warwick and Cargo*, 24 Law Reporter, 494.

Cotton was the article destroyed, which was the subject during the war of special legislation by each belligerent power. It was treated by the army, the navy, and the civil arm of each as possessing extraordinary qualities, and as different from other property, even in the hands of non-combatants. It formed the basis of the credit which the Confederates were seeking to establish abroad for the prosecution of the war. Its retention in the Southern States and withdrawal from market, except

when for war purposes, were considered by the Confederate authorities as of vital importance; for it was hoped that its withdrawal from market would hasten a recognition of the independence of the States in rebellion, and the raising of the blockade which was destroying their resources and crippling their armies.

Prior to the burning of the cotton, the Confederate congress had directed by a legislative act, as a war measure, that cotton and tobacco liable to fall into the hands of the Federal forces should be destroyed; and the history of the period shows that immense quantities of these articles were accordingly destroyed. Regulations upon the subject were adopted by the authorities of the United States; and those regulations, as well as the decisions of the Federal courts, show that both the civil and military authorities deemed it of great importance, to prevent its accumulation in the hands of the Confederate authorities.

Capture of cotton, says Mr. Chief Justice Chase, seems to have been justified by the peculiar character of the property and by positive legislation. It is well known that cotton constituted the main reliance of the rebels to purchase the munitions of war in the foreign market, and it is matter of history that rather than permit it to come into the possession of the national troops, the rebel government everywhere devoted it, however owned, to destruction. *Mrs. Alexander's Cotton,* 2 Wall. 420.

Judicial history shows that, early in 1861, the authorities of seven States, supported by popular majorities, combined for the overthrow of the national Union, and for the establishment within its boundaries of a separate and independent confederation. Pursuant thereto, a governmental organization representing those States was established at Montgomery, first under a provisional constitution, and afterwards under a constitution intended to be permanent. In the course of a few months four other States acceded to that confederation, and the seat of the central authority was transferred to Richmond. It was by the central authority thus organized and under its direction that civil war was prosecuted, upon a vast scale, against the United States for more than four years, and its power was recognized as supreme in nearly the whole of the territory of

the States confederated in insurrection.   *Thorington* v. *Smith*, 8 Wall. 7.

Difficulty, says the Chief Justice, would attend the effort to define the precise character of such a government; but he continues to remark to the effect that the principles relating to *de facto* government will conduct to a conclusion sufficiently accurate.   Examples of a *de facto* government are given by him, where the usurpers expelled the regular authorities from their customary seats and functions, and established themselves in their places, and so became the actual government.

Such adherents to a usurping party in certain cases may not incur the penalty of treason, as the *de jure* government when restored usually respects their public acts; but the Confederate States were never acknowledged by the United States as a *de facto* government in that enlarged sense.   Instead of that, it was regarded as simply the military representative of the insurrection, notwithstanding the duration and vast proportions of the revolt.   Eleven States were engaged in it, and the prior existing governments were overthrown and new governments erected in their stead, in violation of the Constitution and the acts of Congress; and yet it cannot be denied but that by the use of these unlawful and unconstitutional means a government in fact was erected, greater in territory than most of the European governments, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of unexampled dimensions from the period of its commencement to its final termination, during all of which time many belligerent rights were conceded to it by the United States; such as the treatment of captives both on land and sea as prisoners of war, the exchange of prisoners as in international war, their vessels captured recognized as prizes of war and dealt with accordingly, their property seized on land referred to the judicial tribunals for adjudication, their ports blockaded and the blockade maintained by a suitable force, and notified to neutral powers the same as in open and public war.   *Mauran* v. *Insurance Company*, 6 Wall. 1.

Governments *de facto* are described by Mr Chief Justice

Chase as divided into classes; and, after having given a description of two of the classes, he remarks that there is another, called by publicists a *de facto* government, but which might perhaps be more aptly denominated a government of paramount force. Its distinguishing characteristics as given by that magistrate are as follows: 1. That while it exists it must necessarily be obeyed, in civil matters, by private citizens, who, by acts of obedience rendered in submission to such force, do not become responsible as wrong-doers for those acts, though the acts are not warranted by the rightful government. Actual governments of this sort are established over districts differing greatly in extent and conditions. They are usually administered directly by military authority, but they may be administered also by civil authority, supported more or less directly by military force. 2. Historical examples are then given of that sort of *de. facto* government; to wit, the temporary government at Castine during the war of 1812, and the temporary government at Tampico during the Mexican war. *United States* v. *Rice*, 4 Wheat. 253; *Fleming* v. *Page*, 9 How. 615; *The Nuestra Senora*, 4 Wheat. 502.

Those were cases where regular enemy governments acquired the temporary possession of territory during war with the country of which the territory so possessed was a part; and this court adverted to that difference in the case under consideration, but decided unanimously that the government of the insurgent States must be classed among the governments of which those are examples. Among the reasons assigned in support of the conclusion were the following: 1. That rights and obligations of belligerence were conceded to it in its military character very soon after the war began, from motives of humanity and expediency. 2. That the whole territory controlled by it was thereafter held to be enemies' territory, and the inhabitants of the territory were held, in most respects, as enemies; and, as a final conclusion, the court decided that to the extent of the actual supremacy maintained, however unlawfully acquired, the power of the insurgent government cannot be questioned. *Thorington* v. *Smith*, 8 Wall. 11; Halleck, Int. Law, c. 3, sect. 21, p. 74; *United States* v. *Klintock*, 3 Wheat. 150.

Attempt was made early in the war of the rebellion to maintain the theory that the officers and seamen of the Confederate cruisers were pirates, and not entitled to belligerent rights in case of capture. Ships and cargoes at sea were destroyed by such cruisers, and the owners, holding policies of insurance, brought suits to recover for the loss. Payment in certain cases was refused, the defence being that the policies did not cover the loss where the capture was by pirates. Such a case was presented to the Supreme Court of Massachusetts, but the court decided that the persons who seized and burned the ship were not to be regarded as pirates, within the ordinary signification of that word as used in the law of nations, or as commonly understood and applied in maritime contracts and adventures; that they were not common robbers and plunderers on the high seas. The court admitted that the acts of the cruisers were unlawful, and that they could not be justified in the courts of justice, but it proceeded to state that the proofs offered showed that they acted under a semblance of authority which took their case out of that class which can be properly termed ordinary piracy; that the proofs offered showed that they sailed under a letter of marque issued by a government *de facto*, claiming to exercise sovereign powers, and to be authorized to clothe their officers and agents with the rights of belligerents and to send out armed cruisers for the purpose of taking enemy's vessels *jure belli*.

Nor is that all. It was also offered to be proved that at the time of the loss the *de facto* government had proceeded to raise armies and put them into the field, by which an actually existing state of war between it and the United States was created, which had led two of the leading nations of Europe to recognize the persons who had thus conspired together against the authority of the United States as exercising the rights and entitled to the privileges of a belligerent power. Such a seizure, under such circumstances, by an armed cruiser of such *de facto* government, the court held was a capture within the meaning of the policy, and that the insurers were not liable for the loss. *Dole and Another* v. *Merchants' Mutual Marine Insurance Co.*, 6 Allen (Mass.), 373; *Planters' Bank* v. *Union Bank*, 16 Wall. 495.

Two cases of a similar character were pending at the same time in the Circuit Court of the United States for that district, both of which were decided in favor of the insurers upon the same ground. In the first case, the facts were agreed between the parties, as will be seen by the report of the case. *Dole et al.* v. *New England Mutual Marine Insurance Co.*, 2 Cliff. 394. Both judges sat in the case, and their united opinion is fully reported. They decided that, where a ship was taken and burned by the commander of a rebel privateer during the late rebellion, the capture was not a taking by pirates or assailing thieves, inasmuch as it appeared that the policy was executed before the rebellion broke out, and that the commander acted under a commission in due form issued by the government of the rebellious States, and it appears that both parties acquiesced in the decision of the court.

Nor could they well do otherwise, as the agreed statement showed that the rebel States before the loss occurred had organized a confederacy and a government for the same, and had established a written constitution; that such a form of government was in fact organized in all its departments, — legislative, executive, and judicial; that they had raised and organized an army and created a navy, elected a congress, and published a legislative act declaring that war existed between the United States and the Confederate States, and providing measures for its vigorous prosecution; that they were carrying on hostilities at the time the loss occurred against the United States by land and sea, and were in the exercise of all the functions of government over all the territory within their actual military limits.

Pressed with those facts, the plaintiff abandoned the further prosecution of the claim in the first suit, and sued out a writ of error in the second, which was subsequently heard and decided in this court. *Mauran* v. *Insurance Company*, 6 Wall. 1. Offers of proof in this case occupied the place of an agreed statement of facts in the other; but the Supreme Court affirmed the judgment of the Circuit Court, holding that the Confederate States were in the possession of many of the highest attributes of government, sufficiently so to be regarded as the ruling or supreme power of the country within their military dominion,

and that captures made by their cruisers were excepted out of the policy by the warranty of the insured.

Questions of the same character were also presented to the Supreme Court of Pennsylvania about the same time as those presented to the Supreme Court of Massachusetts, where the questions were decided in the same way. *Fifield* v. *Insurance Company of Pennsylvania*, 47 Pa. St. 166. Three opinions were given in the case, in addition to the opinion of the court delivered by the Chief Justice. His first effort was to show that the cruiser was not a pirate, in which he remarked, that if she was not a privateer she was a pirate, and that if she was a privateer she was made so by the commission she bore, the legal effect of which must depend upon the status of the Confederate States, in respect to which his conclusion was that any government, however violent and wrongful in its origin, must be considered a *de facto* government if it was in the full and actual exercise of sovereignty over a territory and people large enough for a nation; and he quotes Vattel in support of the proposition, and finally decided that the cruiser was a privateer and not a pirate, and that the loss was a capture within the excepting clause of the policy, and not a loss by pirates, rovers, or assailing thieves. Emerigon, Ins., c. 12, sects. 28, 412.

Mr. Justice Strong concurred in the judgment, and gave an elaborate opinion, in which he stated that he could not doubt that these revolting States, confederated as they had been, claiming and enforcing authority as they had done, were to be regarded as a government *de facto*.

Two objections to that proposition had been made at the bar: 1. That their claim of sovereignty had been constantly opposed; 2. That their boundaries were uncertain and undefined, — to both of which the judge responded to the effect that neither of the objections were satisfactory: that they were none the less a government *de facto* because they had had no interval of peaceful existence, nor because the geographical boundaries of the district over which their power is exclusively felt were not well defined.

Antecedent to that, the same court decided a similar case, which was also a marine risk, in the same way. Two points ruled by the court in that case are pertinent to the present

investigation: 1. That the loss was covered by the policy, it being a case of capture by armed men professing to act under and by authority of the Confederate States. 2. That the government of the United States had so conducted the contest and so treated the Confederate States as to make it a war in substance as essentially as it could be between foreign powers. *Monongahela Insurance Co.* v. *Chester*, 43 Pa. St. 49; *Hamilton* v. *Dillin*, 21 Wall. 87.

Support to that proposition, of a decisive character, is found in the opinion of the court in the *Prize Cases*, in which Mr. Justice Grier says, It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this line is enemies' property, because it is claimed and held in possession by an organized, hostile, and belligerent power. *Prize Cases*, 2 Black, 674.

Corresponding litigation arose about the same time in other courts, and among the number in the Supreme Court of Maine, where the case was argued by the same eminent counsel as in that cited from the Massachusetts reports. *Dole et al.* v. *Merchants' Mutual Marine Insurance Co.*, 51 Me. 465. Somewhat different views are expressed by the court, but it admits in conclusion that the decision might have been placed on a different ground, and proceeds to remark that war in fact existed at the time of the loss; that hostile forces, each representing a *de facto* government, were arrayed against each other in actual conflict. Its existence, says the court, would not have been more palpable or real if it had been recognized by legislative action, and though it was a civil war, it was not the less a capture for that reason. 51 id. 478; *Horn* v. *Lockhart*, 17 Wall. 55.

During the late rebellion the Confederate States and the States composing it, say the Supreme Court of North Carolina, were to all intents and purposes governments *de facto* with reference to citizens who continued to reside within the Confederate lines; hence the Confederate States and the Constitution of the State and the acts of their congress constituted, *as to such citizens*, during the rebellion, the law of the land. *Franklin* v. *Vannoy et al.*, 66 N. C. 145; *Reynolds* v. *Taylor*, 43 Ala. 420.

Where cotton was destroyed during the late war between the Confederate States and the United States by order of the county provost-marshal, acting in obedience to the orders of the Confederate commanding general, the Supreme Court of Mississippi held that the agent who obeyed these orders is not liable in an action by the owner to recover the value of the property, the court holding that the Confederate States had the rights of a belligerent power, and that it is a legitimate belligerent right to destroy whatever property is the subject of seizure and condemnation, in order to prevent its falling into the hands and coming to the use of the enemy. *Ford* v. *Surget*, 46 Miss. 130. Exceptional cases supporting the opposite view may be found in the State reports; but they are not in accord with the decisions of this court, and are in direct conflict with the great weight of authority derived from the same source.

Without due examination, it may be supposed that support to the opposite theory is derived from the recent decision of this court, in which it is held that certain confiscation proceedings prosecuted under an act passed by the Confederate congress are void; but it requires no argument to show that the remarks upon the subject in the opinion of the court were wholly unnecessary to the decision, as the proceedings were obviously in aid of the rebellion, the intent and purpose of the prosecution having been to raise means to prosecute war against the United States. *Conrad* v. *Waples*, 96 U. S. 279. Authorities to show that all such acts are void are too numerous for citation, no matter what may have been the status of the Confederate States.

Certain decisions of this court hold that the acts of a body exercising an authority in an insurgent State as a legislature must be regarded as valid or invalid, according to the subject-matter of legislation; but the Chief Justice decided in the case hereafter referred to that the governor, legislature, and judges of the State of Virginia, during the war, constituted a *de facto* government, giving as a reason for the conclusion that they exercised complete control over the greater part of the State, proceeding in all the forms of regular organized government, and occupying the capital of the State. *Evans* v. *City of Richmond*, Chase, Dec. 551.

Beyond all doubt, the Confederate government at the period of the alleged wrong was the supreme controlling power of the territory and people within the limits of their military dominion, and it is equally certain that the citizens resident within those limits were utterly destitute of means to resist compliance with military orders emanating from the commanding general, especially when given in obedience to an act of the Confederate congress. *United States* v. *Grossmayer*, 9 Wall. 75; *Sprott* v. *United States*, 20 id. 459.

Cotton during the war was regarded by both belligerents as the subject of seizure and condemnation, and as falling within that class of property which a belligerent might destroy to prevent its falling into the hands of the enemy and augmenting his resources. Proof that the orders were given as alleged is sufficient, as that is fully admitted by the demurrer.

Unless the Confederate States may be regarded as having constituted a *de facto* government for the time or as the supreme controlling power within the limits of their exclusive military sway, then the officers and seamen of their privateers and the officers and soldiers of their army were mere pirates and insurgents, and every officer, seaman, or soldier who killed a Federal officer or soldier in battle, whether on land or the high seas, is liable to indictment, conviction, and sentence for the crime of murder, subject of course to the right to plead amnesty or pardon, if they can make good that defence. Once enter that domain of strife, and countless litigations of endless duration may arise to revive old animosities and to renew and inflame domestic discord, without any public necessity or individual advantage. Wisdom suggests caution, and the counsels of caution forbid any such rash experiment.

Viewed in the light of these suggestions, I am of the opinion that there is no error in the record, and that the decree of the Supreme Court of the State should be affirmed.